Hileman & Gindt, Appellants, v. D. P. Faus et al., Appellees.

**APPEAL AND ERROR:** Assignment of Errors—Assignment by
1　Nonappellant. The assignment of errors by a nonappealing appellee on rulings fully corrected in the trial court presents no question to the appellate court.

**JUDGMENT:** Default—Vacation—Unavoidable Casualty. An un-
2　avoidable casualty sufficient to justify the vacation of a default judgment may consist of a pardonable misunderstanding on the part of counsel as to time when an answer was due.

**PRINCIPAL AND SURETY:** Liability of Surety—Paid Surety—
3　Strict Construction of Contract. Principle recognized that the

contract of a surety who becomes such for a consideration is construed most favorably to the insured.

**PRINCIPAL AND SURETY:** Discharge of Surety—Indemnity Bond—Breaches of Building Contract—Effect. Departures from the terms of a building contract which do not enlarge the liability of the surety on a bond given in connection therewith, are of no consequence when the undertaking of the surety is solely to *indemnify* the obligee from loss in case the obligee, in accordance with the contract, pays out money in discharge of the contractor's liability, and the contractor fails to reimburse the owner (obligee in the bond) therefor.

**CONTRACTS:** Building Contracts—Construction—Allowable Payments—Principal and Surety. A contract for the construction of a building to cost $12,000, "subject to additions and deductions," and providing for payments of "85 per cent of all work completed and all materials on the ground," does not necessarily limit payments in the aggregate to 85 per cent of $12,000. In other words, so long as the owner pays no more than 85 per cent of "all work completed and all materials on the ground," he is not guilty of disregarding his contract, even though such payments exceed 85 per cent of $12,000, it appearing that the contract for $12,000 was less than the actual cost of the building.

**PRINCIPAL AND SURETY:** Discharge of Surety—Contract Below Cost—Effect. The fact that the actual cost of the building is greater than the bid at which the contract was taken, does not release the surety.

**PRINCIPAL AND SURETY:** Discharge of Surety—Failure to Retain Percentage of Payments—Presumption. The presumption that a failure to retain the proper percentage of payments under a building contract is prejudicial to the surety, is rebuttable.

**PRINCIPAL AND SURETY:** Discharge of Surety—Payments Without Architect's Certificate—Effect. Payments on a building contract, without the certificate of the architect, as required by the contract, does not work a release of the surety, if it clearly appears that the payments made were in fact earned, and were within the prescribed limits of the work done.

*Appeal from Black Hawk District Court.*—FRANKLIN C. PLATT, Judge.

THURSDAY, JUNE 29, 1916.

REHEARING DENIED, FRIDAY, NOVEMBER 24, 1916.

THIS action is at law, to recover $4,000 under a bond given by D. P. Faus, as principal, to the appellant, Hileman & Gindt, and signed by the appellee Southern Surety Company, as surety for said D. P. Faus on such bond. There was a trial to a jury, and, at the conclusion of plaintiff's evidence, the court directed a verdict for defendant. The plaintiff appeals.—*Reversed.*

*Edwards, Longley, Ransier & Smith* and *Loren Risk,* for appellant.

*J. T. Sullivan* and *A. G. Moseley,* for appellees.

PRESTON, J.—Appellee surety company has assigned cross-errors by which it is claimed the court erred in overruling its demurrer to the petition, and that the court erred in rendering judgment by default against it.

1. APPEAL AND ERROR: assignment of errors: assignment by nonappellant.

The defendant surety company answered, after its demurrer was overruled, and the default was, on its motion, set aside, and, as it has not appealed, we do not understand that the assignment of cross-errors, under such circumstances, raises any question for determination. The appellee Southern Surety Company for a paid consideration signed the bond upon which suit is brought, as surety for Faus. Hileman & Gindt, as owners, on February 21, 1913, entered into a contract with D. P. Faus, as contractor, by which Faus was to erect a business block for $12,000, to be—

"paid by the owner to the contractor, in current funds, and only upon certificates of the architect, as follows: 85% of all work completed and all materials on the ground to be computed in value on or about the first of each month, and payment made for same upon proper certificate of the architect. The final payment shall be made within 30 days after the completion of the work included in this contract, and all payments shall be due when certificates for the same are issued. If at any time there shall be evidence of any lien or

claim, for which, if established, the owner of the said premises might become liable, and which is chargeable to the contractor, the owner shall have the right to retain out of any payment then due or thereafter to become due, an amount sufficient to completely indemnify him against such lien or claim. Should there prove to be any such claim after all payments are made, the contractor shall refund to the owner all moneys that the latter may be compelled to pay in discharging any lien on said premises made obligatory in consequence of the contractor's default.''

For the purpose of protecting the owners against any liens or claims for which the premises might be liable, and to secure the refund which the contractor was required to make to the owners under the foregoing provisions of the contract, the contractor, Faus, on February 26, 1913, gave to the owners a bond of $4,000, in which he is named as the principal, which recites as follows:

''Whereas, said principal has entered into a certain written contract with the obligee for the substantial erection and completion of all concrete and reinforced concrete work in connection with a building to be erected by the said owner on Mulberry Street, Waterloo, Iowa, in strict accordance with the plans, specifications and contract as prepared by Mortimer B. Cleveland, architect, for the sum of $12,000;

''Now, therefore, the condition of the foregoing obligation is such that, if the said principal shall well and truly indemnify and save harmless the said obligee from any pecuniary loss resulting from the breach of any of the terms, covenants and conditions of the said contract on the part of the said principal to be performed, then this obligation shall be void.; otherwise to remain in full force and effect in law.''

The contract also provides that the owner may take charge of the work in case the contractor fails to perform as set out in the contract, and provides the manner of doing so, and that the owner shall provide labor and material for extras, so as not to delay the contractor. The contractor

commenced the work, and the owners paid, from time to time, without certificates from the architect, but upon presentation of labor accounts and material bills which the owners satisfied themselves had been furnished, and plaintiff claims that at no time was there paid more than "85 per cent of all work completed and all materials on the ground;" although the aggregate amounts paid, up to October 29, 1913, exceeded $12,000 by the sum of $1,362.20. On the last named date, the owners notified the surety company that Faus had not completed the contract, and had abandoned the work. On November 5, 1913, the surety company wrote the owners, denying liability, upon the ground that the owners had "violated your contract with Mr. D. P. Faus in several material matters, and this company, as surety on the contract bond, has been thereby released." On November 7, 1913, another notice was given the surety company. The owners thereupon completed the building according to contract, at an additional expense of $3,092.67, making an entire cost to the owners of $16,454.87, or $4,454.87 above the contract price of $12,000. Proofs of loss were served, and thereafter a suit was commenced by the owners to recover $4,000 of the amount of the surplus payment, which, as they claim, Faus agreed to refund, and, to secure the payment of which refund, the surety company signed the bond sued upon. A default was entered against the surety company, which was afterwards set aside; but on the trial as to Faus, certain credits were allowed Faus, and judgment was rendered for $3,755.85, with interest at 6 per cent from January 20, 1914.

After the court had sustained defendant's motion to direct a verdict in its favor, a stipulation was entered into between the parties to this effect: That, if the case is reversed in the Supreme Court, such judgment may be there entered against the Southern Surety Company in a like amount as that which may be finally recovered by plaintiffs against the defendant Faus in the action now proceeding between plain-

tiff and defendant Faus, not to exceed the sum of $4,000, with interest from October 7, 1913, and costs, which judgment shall provide, upon the payment thereof by the surety company, that it shall be subrogated in like amount to any judgment which plaintiff may recover against said defendant Faus.

The issues, as appellant states them, and the errors assigned, relate: First, to the question whether the default entered against the appellee Southern Surety Company was properly set aside, and the appellee permitted to answer; second, to the question whether the contract with the appellee was breached by the appellant, and the surety company thereby released; and, third, to the question whether the appellee surety company had waived certain of the alleged breaches of the indemnity contract relied upon by appellee as excusing it from the performance of its contract of indemnity.

1. When defendant's demurrer to the petition was submitted, a written stipulation was entered into, to the effect that, if either party did not wish to stand on the ruling which should be made on the demurrer, ten days should be allowed to the defendant to answer or plead, and to the plaintiff to amend.

2. JUDGMENT: default: vacation: unavoidable casualty.

The statute substantially provides that, for unavoidable casualty or misfortune preventing a party from prosecuting or defending, the district court may vacate the final judgment rendered. The ruling on the demurrer was April 24, 1914, and the ten days allowed under the stipulation expired May 4th. An answer in general denial was filed May 6th, and later, on May 11th, the application and showing to set aside the default were filed, and another answer tendered. As we understand it, the defendant at that time did not have a local attorney, and it is made to appear that defendant's counsel was engaged in the trial of a case in New York City. Without setting out the entire showing, it appears that the clerk for defendant's counsel, upon receiving word

that the demurrer had been overruled, made a notation, and by mistake stated that it was overruled on April 29, 1914. Ten days from that date would be May 9th, and in that case the answer first filed would have been in time. The original answer had been prepared before counsel left for New York, as we understand it, and it was thought that he would return to his office in St. Louis in time to direct whether the answer which had been prepared and left in the possession of the clerk should be filed, or whether another answer should be prepared and filed. The showing is that defendant's counsel was misled with reference to the time he had within which to make the filing, and understood it was ten days from April 29th. Without going into this matter further, we think there was no abuse of discretion by the trial court in setting aside the default.

2. It is contended by appellant that the provisions of the contract signed by a surety for hire are to be construed most favorably to the insured, and they cite *Van Buren County v. American Surety Co.*, 137 Iowa 490; *Shorthill Co. v. Aetna Indemnity Co.* (Ia.), 124 N. W. 613;* *Philadelphia v. Fidelity & Dep. Co.* (Pa.), 23 Am. & Eng. Ann. Cases 1085; and note to *Hormel v. American Bonding Co.* (Minn.), 33 L. R. A. (N. S.) 513. Many cases are cited in the note to the L. R. A. case, where it is stated that the overwhelming weight of authority supports the proposition.

3. PRINCIPAL AND SURETY: liability of surety: paid surety: strict construction of contract.

Many of the cases cited by appellee in regard to how the rights of sureties are determined, arose where the sureties were accommodation or uncompensated sureties; and counsel for appellee seek to apply the rules as to such parties to a case where the surety is paid a consideration for signing the bond. A clause in *Bartlett & Kling v. Illinois Surety Co.*, 142 Iowa 538, at page 552, states, in substance, that it

---

* Not officially reported, because nullified on rehearing, by equally divided court.

is immaterial that the surety enters into his obligation for pay; but this was in connection with the language just preceding the statement, to the effect that sureties on a bond to secure the performance of a building contract are discharged by any substantial change or alteration of the plan of work, unless the right to make such change or alteration is expressly given in the bond itself, or in the contract which it secures. The statement first referred to, we think, does not run counter to the general proposition that the rights of a paid surety are most strictly construed against it than a mere accommodation signer without pay, and we think such ought to be the rule.

3. Plaintiff contends that, so far as the alleged breaches by plaintiff of the terms of the building contract were made grounds of the motion to direct a verdict, sustaining the motion was error, because the appellee was not, under the express terms of its contract, a surety for the performance of the building contract made by Faus and appellants, but was surety to the indemnifying contract made by the contractor Faus; and second, that, if appellee's contract is to be held as one of surety for the performance of the building contract, sustaining the motion, so far as on the grounds above referred to, was error, because: There was no proof that the amounts paid by appellants exceeded in value "85 per cent of all work completed and all materials on the ground," at the time the payments complained of were made; that no prejudice to appellee is shown to have resulted therefrom; that the final payment was not made until after the contractor had abandoned the contract; and that no prejudice resulted from the failure to secure the architect's certificates before payments were made; and it does not appear that the payments were made for less than the value of the labor and the materials at the time of their making.

Appellants also contend that, so far as the alleged breaches by it of the conditions of the indemnity contract itself were made grounds of the motion to direct, sustaining

the motion was error, because: The appellee waived all of said alleged defenses by its letter, which placed its refusal to pay solely upon violations by plaintiffs of their building contract with the contractor; the question was for the jury as to whether a breach had occurred; and the provisions of the contract for notice of default are liberally construed in favor of the obligee.

On the other hand, appellee contends that, because of plaintiff's notice of forfeiture to the defendant surety company, and its demand on defendant that it furnish sufficient money to complete the building in accordance with the contract, or that the company complete the same under the conditions of the bond, and because a condition of the bond provides that, in case of default on the part of the contractor, the surety shall have the right, if it so desire, to assume and complete the contract, therefore the understanding of the parties was that defendant was surety upon the building contract, and that the defendant company was not surety only to the indemnifying contract made by the contractor.

We do not deem it necessary to construe the effect of the provisions of the contracts as to whether the defendant was surety for the completion of the building, if plaintiff was making such a claim. Plaintiff's claim is that it paid out money to complete the contract according to its terms, and that it is entitled to be indemnified and paid by the defendant surety company the amount of money it paid to complete the contract according to its terms. They contend that, so far as the claim they make is concerned, under the evidence, the bond was for indemnity, in case the principal failed to repay or refund, and it relates only to payment of certain indemnities which might accrue after the completion or abandonment of the building contract, and they say that, this being so, departures from the building

4. PRINCIPAL AND SURETY: discharge of surety: indemnity bond: breaches of building contract: effect.

contract could not be used by the surety to cancel its liability. One condition of the bond is that:

"If the said principal shall well and truly indemnify and save harmless the said obligee from any pecuniary loss," etc.

Plaintiffs state their proposition at this point in this way: That "to indemnify" means "to secure against loss, to save harmless, to make good, to reimburse;" and that there is no liability of the principal or surety on indemnity bond until there has been an actual expenditure by the obligee which has not been repaid, citing *Cousins v. Paxton & Gallagher Co.*, 122 Iowa 465; *Finley v. United States Cas. Co.*, 113 Tenn. 592 (83 S. W. 2); *Frye v. Bath Gas, etc., Co.*, 97 Me. 241 (54 Atl. 395); *Burke v. London G. & A. Co.*, 93 N. Y. Supp. 652; *Maloney v. Nelson*, 144 N. Y. 182, 186 (39 N. E. 82); *American E. L. Ins. Co. v. Fordyce*, 62 Ark. 562 (36 S. W. 1051).

As to the distinction between indemnity and guaranty contracts, appellee states the rule, citing cases in support thereof, that, in an indemnity contract, a promise is made to protect the promisee against the consequences of some act which he has performed, or is about to perform; whereas, in the latter case, a promise is made to protect the promisee against some act which is to be performed by a third party. The *Cousins* case, supra, decided by this court, is in point. In *American E. L. Ins. Co. v. Fordyce*, supra, it was held that the difference between a contract of indemnity and one to pay legal liabilities, is that, upon the former, an action cannot be brought and a recovery had until the liability is discharged; whereas, upon the latter, the cause of action is complete when the liability attaches. The distinction thus pointed out is the element which distinguishes the bond in suit, especially as to plaintiff's claim for a refund of money paid by it, from bonds which are given to secure the performance of a building contract. The liability of the defendant surety company attached when Faus, as the principal in

the indemnity bond, failed to make good the amounts which the owners had actually paid to discharge Faus' liabilities under the building contract, and which Faus failed to repay. The rights of subcontractors are recognized in the contract, and the contractor agrees therein to refund to the owner all money that the owner may be compelled to pay in discharging such liens. The contract also provides that, on failure of the contractor to prosecute the work, the owner may complete it, and if the cost exceeds the contract price, the contractor shall pay the difference to the owner. Appellants say that it was principally to secure the refund and repayment provided for in these last two provisions that the bond in suit was taken. There was no other pecuniary loss which the contractor agreed to indemnify the owners against than such as would arise either from the owner's being obliged to pay subcontractors, which the principal agreed to refund, or the owner's paying an excess over the contract to complete an uncompleted or abandoned contract, which the contractor agreed to repay. That is what happened in this case.

Under the evidence, the bond was not breached so much because of the failure of Faus to complete the contract as by his failure to make the refund, and the payments specified in a bond or contract for the repayment or refunding of whatever amount of money may be due from a contractor to an owner after the contract has been either closed up or abandoned. There is no cause of action until after the transactions between the owner and contractor are ended and the contractor has breached his contract to repay; and, in such a case, breach of the provisions of the contract by the owner is not of so much consequence to the surety upon the indemnifying bond, except in so far as such a breach enlarges the indemnity otherwise to be paid, for which the surety upon such indemnifying bond may be liable. It would seem, then, that the alleged breaches of the building contract

which appellee claims were committed by appellant, did not increase the loss or indemnity which the contractor, and the appellee, as surety, agreed to pay under the contract of indemnity.

A question arises as to the construction of one of the provisions of the building contract, and that is whether the 85 per cent in the contract refers to the contract price, or to the completed work and materials on the ground. As we understand it, the trial court held, that, because more than 85 per cent of the contract price was paid by the owners, the surety bond was discharged, although not more than 85 per cent was paid of the completed work and materials on the ground. The building contract between the owners and Faus as contractor contemplated the erection of a building according to certain plans. It also contemplated alterations from such plans, and provided for ascertaining the cost thereof. The sum to be paid was:

5. CONTRACTS: building contracts: construction: allowable payments: principal and surety.

"$12,000, subject to additions and deductions as hereinbefore provided, and that such sum shall be paid by the owner to the contractor in current funds and only upon certificates of the architect as follows: 85 per cent of all work completed, and all materials on the ground to be computed in value on or about the first of each month, and payment made for the same upon proper certificates of the architect."

It would seem that the cost of this building was not limited to $12,000, but might include more, if alterations which increased the cost to that extent were agreed to. The cost was to be $12,000, subject to additions, and was to be paid, 85 per cent of all work completed and all materials on the ground, whether the 85 per cent exceeded $12,000 or not. We think a proper construction of these words is that the 85 per cent applies to the "work completed and all materials on the ground," and is not limited to the $12,000

alone. We think the record shows that the owner and contractor by their conduct put this construction upon the contract. Under the provisions, the owner had the right to retain such a sum as would equal 15 per cent of all work completed and all materials on the ground, and the record is that the owners did at all times retain more than 15 per cent of the completed work and materials on the ground, and did not at any time pay more than 85 per cent thereof. They did, however, pay more than 85 per cent of $12,000. It may be that the owners would have had the right to stop paying with $10,200 ($12,000 less 15 per cent), and the added cost of alterations; but we think they also had the right to rely upon the provision that:

"The contractor shall refund to the owner all moneys that the latter may be compelled to pay in discharging any lien on said premises made obligatory in consequence of the contractor's default."

The material had been furnished and the work had been completed to such an extent that the total payments made at any time up to the time the contractor abandoned the work did not exceed 85 per cent thereof; and the owners doubtless believed that, in order to get their building, they had to keep on paying so long as that condition existed, and relied upon their contract for a refund, the payment of which refund they took a bond to secure. It may be remarked, in passing, that it seems clear that the contractor took the contract to build for less than he could afford to do.

*Graves v. Merrill* (Minn.), 70 N. W. 562, was a somewhat similar case, in which it was held, substantially, that, although the amount paid by the owner was more than 85 per cent of the contract price, as there was neither finding nor evidence that such payments at any time exceeded 85 per cent "of the total amount of materials and labor furnished there at the building," there was no overpayment.

The record shows that the full cost of the material and

labor in the building in the instant case was $16,454, and
when the contractor abandoned it, there had been paid by
the owners to the subcontractors $13,362, so that, of the cost
price of the building, there was yet unpaid by the owners
$3,092, which is more than 15 per cent of the cost, and is 25
per cent of the contract price. Appellant contends that if,
then, under this contract, the percentage clause applies to
the $12,000 contract price, there is nothing in the contract
or bond by which the court must find as a matter of law that
the percentage which these owners should withhold is repre-
sented by and included in the $13,362 paid, instead of in the
$3,092 which was unpaid, and they say that, the defense
interposed being an affirmative one, it should not be held
that the 15 per cent is not included in and represented by
the $3,092 which the owners still had in their hands when
the contractor abandoned the work and the surety company
elected not to complete it.

4.   It should be kept in mind that no part of the pay-
ments made by plaintiffs went to the contractor. It was
all paid for labor and material in this building. The items
shown in one of the lists included the mate-
6. PRINCIPAL AND
   SURETY : dis-
   charge of sure-
   ty : contract be-
   low cost: effect.
rial that had been furnished before the con-
tractor left the job. As stated, it appears
that the contractor took the contract too low.
The owners may have doubted the contractor's ability to
erect the building for $12,000, and they required him to agree
to refund the extra cost, if such proved to be the case, and
required a bond that up to $4,000 at least would be refunded.
The building did cost more, and, under the evidence, could
not have been built for less than was paid; so that, when the
contractor started the work, he was bound to lose.

If the contractor had stopped the work when first begun,
the owners could have proceeded to complete it, and require
the contractor and his surety to pay the cost over the con-
tract price, and in that case the cost and loss would have

been just the same as it is now. Or, if the contractor had abandoned the work when just $12,000 of the work had been done and exactly $10,200 had been paid, the loss would have been just the same as it is now; and so it is where $16,454 of work has been completed and material furnished, and more than 15 per cent of it (which would be $2,468) was retained, the loss is still the same. The contractor was not damaged or prejudiced in any manner, and the surety, for the same reasons, was not damaged or prejudiced. This being so, the surety ought not to be released because of this matter.

Cases are cited holding that a provision in a building contract to retain a percentage inures to the benefit of the surety who guarantees performance of the building contract, and that prejudice is presumed from a failure to retain such percentage. But in cases where the surety was released on that ground, the owner had paid money to the contractor, so that it was not used in the performance of the contract. Where the money is paid to the contractor, the surety might be prejudiced, because the contractor might use the money for his own separate purposes, and leave the surety to pay for the labor and materials to complete the building. The presumption referred to is open to rebuttal. We think the correct rule for determining the liability of hired sureties is stated by the Supreme Court of Michigan, in *Doyle v. Faust*, 153 N. W. 725, where it is said:

7. PRINCIPAL AND SURETY: discharge of surety: failure to retain percentage of payments: presumption.

"The surety may not stand upon the strict letter of its undertaking and demand to be released therefrom for any and every variation in the terms or the performance of its principal's contract, with reference to which the surety's agreement is made, but it may insist upon the compliance with requirements, clearly expressed, which are made the condition to liability."

In that case, the court refers to the Iowa case of *Queal v. Stradley*, 117 Iowa 748, as illustrating the strict rule that

a surety may stand upon the letter of its contract. But in
the *Queal* case, the sureties were not paid

**8. PRINCIPAL AND SURETY: discharge of surety: payments without architect's certificate: effect.**

sureties, but merely accommodation signers.
In the instant case, the surety company could
have no claim upon any portion of even the
cost price of this building beyond the 15 per
cent. The 15 per cent was not to go to it, but to protect it
from loss. That percentage must be applied in such a man-
ner as to diminish its liability, and, with respect to such per-
centage, the most that could be claimed by the surety com-
pany was the right to direct the application of such payment
for its benefit. As the surety company did not assume to
perform the contract, it had no right to require it to be paid
to anyone other than a subcontractor entitled to a lien, and,
when it was in fact paid by the owners to such subcontractors,
such payment operated for the benefit of the surety with
equal effect whether the surety did or did not direct the pay-
ment to be made to any subcontractor.

As to appellee's claim that payments were made which
were not made on certificates of an architect, we think the
question is ruled by *Getchell & M. Lbr. Co. v. Peterson*, 124
Iowa 599; *Getchell & M. Lbr. Co. v. National Surety Co.*,
124 Iowa 617.

Other questions are argued, but we think those discussed
are decisive of the case, and it follows therefrom that the
judgment must be reversed, and, under the stipulation, judg-
ment will be entered in this court for the same amount ren-
dered against the contractor Faus, which was $3,958.60, and
interest will be computed at 6 per cent from December 14,
1914, the date of the judgment against Faus. Upon payment
by appellee it will be subrogated as provided in stipulation.—
*Reversed.*

EVANS, C. J., DEEMER and LADD, JJ., concur.