## GALVESTON CAUSEWAY CONST. CO. et al. v. GALVESTON, H. & S. A. RY. CO. et al.

(District Court, S. D. Texas, at Houston. August 15, 1922.)

No. 154.

1. **Railroads ⬤⟹121—Contract for joint use of trackage held not an unlawful "consolidation of competing lines of railway."**

   A lease expressly authorized by legislative act between the county and different railroad companies operating competing lines, by which the latter were given the joint use of trackage over a causeway across Galveston Bay for entrance into the city of Galveston, *held* not a consolidation of competing lines of railway within the prohibition of Const. Tex. art. 10, § 5.

2. **Constitutional law ⬤⟹20—Legislative construction of ambiguous provision prima facie correct.**

   Where a constitutional provision is susceptible of different constructions the construction placed on it by the Legislature is entitled to great weight, and a legislative act based on such construction is prima facie valid.

3. **Railroads ⬤⟹121—Question of legality of contract cannot be raised collaterally.**

   The objection that a contract, to which railroad companies are parties is in violation of the state Constitution cannot be raised collaterally by private parties.

4. **Cancellation of instruments ⬤⟹5—Contract not made unconscionable by after-occurring conditions.**

   Where complainant contracted to build a causeway, requiring several months, within a stated limit of cost, and the other parties made the contract because of, and in reliance on, such limitation, the fact that war conditions arising afterward and unforeseen made completion of the work within such limit impossible does not afford ground upon which a court of equity may decree cancellation of the contract as unconscionable.

5. **Principal and agent ⬤⟹3(2)—Agent may bind himself by contract with principal.**

   One who contracts to build a structure for another at cost plus a sum for services, though considered an agent, may bind himself by the contract to complete the structure within a stated limit of cost.

6. **Cancellation of instruments ⬤⟹18—Misrepresentations waived by proceeding with contract.**

   A party seeking relief in equity from misrepresentations by way of cancellation of a contract must proceed speedily, and cannot occupy the inconsistent position of going on with the contract and at the same time claiming the right to rescind.

7. **Contracts ⬤⟹284(4)—Decision of engineer under construction contract held conclusive in absence of fraud.**

   Where by a construction contract the engineer is authorized to determine disputed questions, in the absence of fraud his decision is conclusive on the parties.

8. **Contracts ⬤⟹306(2)—Contractor held not entitled to equitable relief for termination of contract.**

   Claim of a contractor for construction work to equitable relief on the ground that the contract was prematurely terminated and the work taken over by the owner *held* without merit where, as admitted by the contractor at the time, and as known by both parties, it was insolvent and without credit and unable to proceed further with the work.

⬤⟹For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**9. Principal and surety ⊚⇒59—Rule of strictissimis juris not applicable to contracts of compensated surety.**

In respect to the rule of strictissimis juris, as applied to the contracts of sureties, a distinction should be made between compensated and uncompensated sureties, and contracts of the former should be given the same reasonable construction as other contracts based upon a monetary consideration.

**10. Principal and surety ⊚⇒7—Surety for contractor held not released by failure of one of owners to sign contract.**

The fact that a contract between a contractor for construction work and a number of parties as owners was not signed by one of such parties until late in the performance of the work *held* not to release the compensated surety of the contractor from liability; the failure to sign being of no practical importance, as the other parties were solvent and were jointly and severally bound.

**11. Frauds, statute of ⊚⇒49—Contract which might be performed within year not within statute.**

A contract for construction work which allowed two years as the outside limit for performance, but which by its terms authorized completion of the work within one year or less, *held* not within the statute.

**12. Contracts ⊚⇒32—Agreement to be reduced to writing held effective without signatures of all the parties.**

Any contract not within the statute of frauds, which the parties have agreed to put in writing and sign, is, when put in writing and signed by one of them, effective as to the others, unless there is an express provision or clear implication that it is not to take effect until signed by all parties.

**13. Equity ⊚⇒57—Equity regards that as done which ought to have been done.**

Under the rule that equity regards that as done which ought to have been done, a compensated surety was not released because the contract for construction work between the principal, a contractor, and a number of parties as owners was not signed by one of such parties, where, without protest by any one, the work was undertaken and set on foot by the contractor, and the signatures of all were finally affixed long before any trouble or litigation arose.

**14. Principal and surety ⊚⇒100(1)—Surety held not released by principal's failure to obtain surety's consent to change in work under contract.**

Under a construction contract which required the contractor to secure the consent in writing of its bondsmen to any change in the contract, but where the bond provided that nothing done or omitted by the other parties should relieve the surety from its obligation, the surety *held* not released from liability because its principal failed to secure its consent to a change in the work required by the engineer in charge.

In Equity. Suit by the Galveston Causeway Construction Company and another against the Galveston, Harrisburg & San Antonio Railway Company and others. Bill dismissed, and decree for defendants on cross-claim.

Hunt & Teagle and Presley K. Ewing, all of Houston, Tex. (J. A. McCullough, of Baltimore, Md., of counsel), for complainants.

Terry, Cavin & Mills and C. H. Theobald, all of Galveston, Tex., and Baker, Botts, Parker & Garwood, of Houston, Tex. (J. W. Terry, of Galveston, Tex., and Palmer Hutcheson and J. H. Tallichet, both of Houston, Tex., of counsel), for defendants.

HUTCHESON, District Judge. This controversy presents a bill in equity brought by the Galveston Causeway Construction Company and

⊚⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

the United States Fidelity & Guaranty Company against the steam railroad corporations Galveston, Harrisburg & San Antonio Railway Company, Gulf, Colorado & Santa Fé Railway Company, and Galveston, Houston & Henderson Railroad Company, and the interurban railway Galveston-Houston Electric Railway Company, and also against the county of Galveston, to obtain equitable relief against a certain contract of September 15, 1917, for the construction and reconstruction in part of a specified causeway across Galveston Bay between Galveston Island and Virginia Point in Galveston county, and a counterclaim by the named defendants setting up the making of the contract, its breach by complainants, and the damage flowing to defendants from the breach, measured by the amount over and above the contract price which the counterclaimants alleged they had been compelled to pay to complete the contract.

The underlying facts are in the main undisputed, and a brief preliminary statement of these facts will make clear the contentions of the parties, and serve as a proper introduction to the court's opinion as to them.

On December 15, 1908, Galveston Island then being connected with the mainland by only one railroad bridge, and by no bridge whatsoever for vehicles and foot passengers, which condition had existed since the storm of September, 1900, the county of Galveston, as lessor, and the Gulf, Colorado & Santa Fé Railway Company, Galveston, Houston & Henderson Railroad Company, the Galveston, Harrisburg & San Antonio Railway Company, and Galveston-Houston Electric Railway Company, as lessees, entered into a certain contract of lease which had theretofore been authorized, and was afterwards explicitly ratified by appropriate legislative action, under the terms of which the original Galveston causeway was constructed and thereafter operated.

The companies owning the three steam lines are the lessees of a certain portion of said causeway, and the company owning the electric or interurban line is the lessee of another and distinct portion thereof. This lease was for a term of 999 years from and after December 15, 1908.

On August 16 and 17, 1915, the causeway was damaged and in part destroyed. The steam lines immediately built on the site of the destroyed portion of the causeway a pile trestle, and thereafter all their trains, together with the trains of the interurban company, entered Galveston by means of said trestle. The county afterwards replaced the destroyed portion of its roadway with a pile wagon bridge. These facilities were being maintained and operated during the years 1916 and 1917, when it was agreed by all parties to reconstruct the destroyed portion of the causeway and repair the remainder within a limit of cost of $1,500,000.

The causeway owners, as the county of Galveston, the three steam railroads, and the interurban are, for convenience, designated, settled their differences as to the type of structure to be used by agreeing to accept the plans of William Mueser, of New York, for the type of structure recommended to them by a board of arbitrators.

Thereafter the said William Mueser prepared complete plans and specifications in accordance with the award of the arbitrators, and bids

for the performance of the work in accordance with said plans and specifications and of the contract to be thereafter prepared and agreed upon were requested of a limited number of contractors.

Larkin & Sangster, who had theretofore done business as a copartnership, obtained the privilege of bidding on the work in the name of a corporation with limited liability, called Larkin & Sangster, Inc.

Said corporation, after making such investigation as its officers desired or deemed necessary, submitted a bid guaranteeing to perform the whole work contemplated by the plans and specifications for the sum of $1,704,000. Said bid, being in excess of the amount which the several causeway owners were willing to expend for the work, was not accepted.

Thereafter the said corporation, through its officers, negotiated with the causeway owners, including the county of Galveston, and a committee of citizens representing the county, and as a result submitted a revised or amended bid in which it offered to complete the entire work for the actual cost of the work, plus the sum of $250,000, which was to constitute the contractors' sole and only compensation for its services of all kinds, and in which it guaranteed that the total cost would not exceed $1,645,000.

Other expenses in connection with the work, but not included in the bid or contract, were estimated at the sum of $80,000. This cost and expense was wholly separate and apart from any and all cost and expense of the work covered by said contract.

Thereafter the several causeway owners made and entered into a supplemental contract of lease in which the county of Galveston guaranteed to the other parties that the whole cost of the work, that undertaken by the contractor, $1,645,000, and the outside and additional expenses above referred to, $80,000, should not in any event exceed the sum of $1,725,000, and said county agreed and bound itself, being induced to do so by the bid and guarantee of the contractor, which was subsequently reduced to writing in the form of a contract and surety bond, that it would pay and bear any and all cost of the work in excess of said sum of $1,725,000.

An agreement pursuant to the bid of the contractor was prepared by counsel for the causeway owners. Various changes and amendments were discussed and adopted, and same was fully and completely accepted and agreed upon by all the causeway interests and officers of the contractors.

Prior to September 15, 1917, which date was the date borne by said agreement, as well as by the supplemental contract of lease, the agreement, with the bond which accompanied it, was delivered to the officers of the contractor in printed form, but with spaces for all signatures left blank. It was executed by the contractors on or about September 15, 1917, and by the complainant United States Fidelity & Guaranty Company on September 28, 1917. Thereafter, and during the remainder of the year 1917, it was at various times signed by the other parties, except the Galveston, Houston & Henderson Railroad Company, which did not sign it until November 16, 1919.

At or about the time of the execution of the bond the surety com-

pany received its premium for two years, together with a deposit by way of security in the sum of $50,000, all of which it has ever since retained.

The complainants, in describing this contract in their bill, say:

"That complainant Larkin & Sangster, Inc., entered into written contract, bearing date September 15, 1917, with the defendants steam railway companies, recited as acting for themselves and for the defendant county of Galveston, and with the defendant Galveston Houston Electric Company, parties of the first part, hereinafter styled railway companies, for the reconstruction and repair on the terms and conditions therein set forth of those certain portions of the causeway across Galveston Bay between Galveston Island and Virginia Point, in Galveston county, Tex., described in the general specifications as the extension of the present arch and bridge toward Virginia Point on the mainland and Galveston Island, by the addition to said present arch bridge of specified arch construction, together with the complete rehabilitation of the then remaining portions of the original protected roadway (except as to superstructure consisting of ballast and tracks on the railroad and interurban sections, and pavement of the county road section) comprising the causeway in its entirety, save and except the original arch bridge and original lift bridge as heretofore constructed and now existing; such work to be prosecuted, performed, and completed to the satisfaction of the supervising engineer therein mentioned, and in strict conformity with the general specifications and plans thereby referred to, and such further details and instructions as such supervising engineer might, in writing, from time to time furnish or issue for the purpose of insuring the thorough execution of the work in a most thorough manner, and within the time therein specified.

"(2) That said railway companies were to pay for such work $1,645,000, according to the terms and conditions of such contract, to include all necessary labor, materials, tools, appliances, apparatus, ways, machinery, tugs, barges, pile drivers, plant, and equipment, but in such price there was figured $250,000, to constitute the sole and only compensation for the services of all kinds of complainant Larkin & Sangster, Inc., including its compensation for the use, as also depreciation, loss, and damages and destruction, of all large tools, apparatus, appliances, ways, machinery, tugs, barges, pile drivers, plant, and equipment used or intended to be used on or about such work, and also premiums for its bond in the undertaking, and its profit, said complainant Larkin & Sangster, Inc., thereby guaranteeing or insuring the maximum cost of such work to said railway companies and the other causeway owners not to exceed $1,645,000; then complainant Larkin & Sangster, Inc., was to have of the saving 20 per cent., the remaining 80 per cent. to belong to the defendants."

On or about September 15, 1917, the contractor began work toward the performance of its contract, receiving from time to time from the causeway owners the whole cost of the work, and in addition the sum of $127,000 in part payment of the contractor's compensation of $250,-000, and during the whole period of the work no serious dispute or friction of any kind arose between the county and the engineer.

Owing to many circumstances, the most significant and serious being after the fall of 1917, the scarcity and difficulty of obtaining efficient labor at all, and then only at high wages, there was great delay in completing the contract, and it could not be completed within the guaranteed cost. On May 17, 1920, the contractor wrote to the chairman of the board of managers of the causeway, stating that according to the contractor's estimate it would take $385,000 to complete the causeway, and that there was then available on the unpaid balance of the contract price the sum of about $40,000, plus the cost of so-called extra work ordered by the board, estimated at $21,000. Said letter also stated that the con-

tractor was entirely without funds to proceed with the completion of the work after the balance hereinbefore mentioned will have been paid to it. It recited negotiations with the surety company, complainant herein, the offer of that company to pay $150,000 for a release of its obligation on the bond, and it asked what, if any, concessions might be made to the said contractor.

It concluded with the statement that the time when it would be out of funds to continue operations was very short, and that it had agreed with the surety company to advise it with respect to the decision of the causeway owners at as early a date as possible.

On or about June 15, 1920, the contractor delivered to the causeway owners a letter dated June 9, 1920, in which the contractor declared it was unable to complete the work, that its inability to do so arose from the fact that the maximum cost provided for in the contract had been exhausted, and that the contractor had no funds with which to complete the undertaking, and with said letter the contractor delivered to the causeway owners an assignment duly executed and bearing the same date, transferring to the causeway owners four contracts for material for the causeway work, reciting that the last-named contract had been made for the benefit of the causeway owners, as they were named in the agreement of September 15, 1917.

. Thereupon the causeway owners gave to the contractor notice in writing, according to article 6 of the agreement last above mentioned, to cease work and vacate the premises at 5 p. m. on June 17, 1920, which the contractor, without protest or objection other than to express his disappointment at not having been able to make new arrangements with the causeway owners, did.

As to the letter of June 9, delivered on June 15, the testimony contains considerable dispute as to what was the purpose of the letter—the contractor claiming it was not intended by him as a surrender of his contract, but was for the purpose of enabling him to make new arrangements, and only as a preliminary to that end; the causeway owners that it was for the purpose that its terms indicated, of advising the causeway owners of its inability to go further. But it is clear from the evidence that, whatever was the purpose or hope of the contractor with reference to making a new arrangement, the letter in fact expressed, and intended to express, the fact, which was an admitted one, that the contractor could go no further under the old arrangement, as the fund provided by it was exhausted, for at the time of stopping the work and vacating the premises there had been paid to the contractor by the causeway owners the full sum of the guaranteed amount.

Considerable contention was made on the trial as to whether or not the company was insolvent at the time the work was taken over by the defendants.

It is my view that there can be no doubt that the company was insolvent, as it was a company formed merely for the purpose of doing this particular job, and had no assets except such as had been employed in the job, and that the obligation to perform the contract would have required the expenditure of far more money than the company had or could obtain. It is also clear that it had no credit with which to go for-

ward. It was therefore insolvent both in the sense of the bankruptcy law, in owing more debts than it had assets to meet, and in the ordinary contemplation of having no liquid assets to meet its present obligations.

The causeway owners thereupon proceeded with another contractor selected by them to complete the work, and at the time of the trial of this case they had expended on this account, and here sue for, the sum of $652,626.45 in excess of the guaranteed cost.

On the 30th day of August, 1921, a year after the contract had been taken over by the railway companies, the complainants, anticipating that an action would be filed against them to recover on the contract, filed this bill, seeking therein and thereby to have the contract as such declared a nullity, and to have an accounting between the parties, and ex æquo et bono to have adjudged as between them what was required of each with reference to the other. The bill in effect declared the contract a nullity, but that the transaction of the causeway work should be considered upon a basis of quantum meruit, and that after such consideration a decree be entered releasing the surety from any obligation, and awarding to the complainant contractor sums which, according to the bill, said complainant deemed itself entitled to. To secure this result the complainants, contractor and surety, jointly rely upon the following propositions:

(1) That by the causeway contract, in connection with the leases from the county of Galveston, a consolidation of the property of the railway and interurban companies, which were and are competing lines, was contemplated and effected; that said causeway contract was an integral part of the whole arrangement and was therefore rendered void and unenforceable as in contravention of section 5, art. 10, of the Constitution of the state of Texas, forbidding railway consolidation.

(2) That the guaranteed cost was so grossly inadequate as to shock the conscience, and, besides, the contract itself abounded in such harsh and oppressive provisions, in that it put the entire risk with the contractor, and the entire control with the owners, as, coupled with the gross inadequacy of the price, to make any recovery on the contract inequitable.

(3) That the causeway owners had misled the contractor by the plans and specifications, in that they declared that hard red clay would usually be found in all foundation pits at about 8 feet below mean low water, and that there would be required piling of about 19 to 24 feet in length, which representations Larkin & Sangster, Inc., believed, whereas it developed that a considerable number of such pits were in the nature of quicksand or other improper soil, and it became necessary for the contractor, under the direction and requirement of the engineers, to substitute and use in such foundation pits piling of from 30 to 35 feet in length, whereby the work was delayed, and the cost tremendously increased; that such misrepresentations as to the expectations were either the result of mutual mistake or of deliberate fraud.

(4) That the contractor was prematurely and improperly discharged from the work, not in accordance with, but contrary to, the provisions of the contract, and that such discharge of the contractor and taking the work from him made the contract no longer effectual.

These points are 1, 2, 3, and 6 of complainants' brief. In addition to these points, it is urged on behalf of the surety company that, whatever may be the result as to the contractors, the surety company is entitled to be released (point 4 of the brief), for that the contract never became effective as to the surety company, because it signed the surety bond of September 28, 1917, with its principal upon the condition at least implied that the causeway owners should, within a reasonable time, execute the contract; that without its knowledge or consent, one of the parties, to wit, the Galveston, Houston & Henderson Railroad did not execute the contract until after two years later, and (point 5 of the brief), for that the change of plan from the shorter to the longer piling on account of the difficulties encountered in sinking the foundations was a change of the contract which released the surety, especially in view of subdivision (c), art. 12, of the contract which provided that—

· "The contractor, before proceeding to execute any change in the plans, should secure the consent in writing of the bondsmen, and file same with the supervising engineer."

After careful consideration of the briefs and an examination of the authorities cited, I am left in no doubt that, were the case attended with the inequitable features which the bill of complainants, and especially the arguments, assume for it, this court would not only be authorized, but required, to deny relief upon the contract, whatever its authority would be to adjust the rights of the parties upon the facts, the contract excluded; and I have reached the opposite conclusion from that contended for by complainants, not because of any doubt of the general soundness of the legal views presented by complainants' counsel, but because of my opinion that they are wholly inapplicable to the established facts.

In the course of this opinion I shall, in justice to complainants, endeavor to make clear my points of divergence from them.

[1] The first point presents an effort to bring within constitutional condemnation a situation of public necessity, where by joint arrangement between the county of Galveston and the railroads desiring to enter it, with the sanction of the state expressed by direct legislative act, provision was made in the most economical and reasonable way for a connection between Galveston and the mainland.

The provision of the Constitution sought to be invoked in section 5, art. 10, designed to prevent mergers and consolidations hurtful to the public interests, and whose terms as to consolidation are: ·

"No railroad or other corporation, or the lessees, purchasers or managers of any railroad corporation, shall consolidate the stock, property or franchises of such corporation with, or lease or purchase the works or franchises of, or in any way control any railroad corporation owning or having under its control a parallel or competing line; nor shall any officer of such railroad corporation act as officer of any other railroad corporation owning or having the control of a parallel or competing line."

It is clear that that provision is effective and powerful to prevent mergers and consolidations of the property and powers of one railroad with the property and powers of the other. It has never been supposed that joint trackage arrangements or joint depot or terminal uses are a

consolidation and forbidden by our laws. Neither the language used nor the uniform construction given to that language by the courts and legislative bodies would sustain such a construction. Union Pac. Ry. Co. v. Chicago, Milwaukee & St. Paul Ry., 163 U. S. 564, 16 Sup. Ct. 1173, 41 L. Ed. 265 ; 33 Cyc. 422.

[2] But, assuming that the language, standing alone and uninterpreted by legislative act, would give even color to the claim that an arrangement of the character here under discussion was a consolidation, it is entirely clear upon the authorities that, where it is sought to strike down an act of the Legislature by the force of some constitutional provision, it is an entirely proper canon of judicial construction that the act of the Legislature itself, where the constitutional provision might be susceptible of different constructions, is entitled to have great weight, and that in matters of a public nature the legislative construction of the Constitution is prima facie valid. City of Houston v. Scottish Rite Ben. Ass'n (Tex. Civ. App.) 233 S. W. 555, where the court says :

"From the authorities cited we think it clear that the term 'purely public charity,' as used in our Constitution, is of doubtful meaning, and that our Legislature had the power to define such term as it did do, * * * and under such circumstances the statutory definition should be followed by the courts."

And though the judgment of the Court of Civil Appeals was reversed in the same case (230 S. W. 979) on certified questions, the authority of the Legislature to construe the Constitution was impliedly, if not directly, declared, in this language :

"In our opinion, the Legislature might reasonably conclude that an institution was one of purely public charity," etc. 230 S. W. 981.

[3] In addition, I think it cannot be doubted that, if there was any illegality in the arrangement between the county of Galveston and the railroads, that illegality would have to be asserted by quo warranto on behalf of the state. Upon no theory could these complainants be entitled to raise the question, since the consolidation, if it was one, was made not by the causeway contract, but by the agreement of lease, and a recovery for the breach of the contract obligations would be a matter wholly collateral to, and independent of, the lease contract which makes the illegality, if in fact illegality exists.

[4] It is on the second point that counsel for complainants have pitched their major argument that, the contract being unconscionable in price and in terms, a court of equity would relieve against it.

The facts being what they are, I am constrained to believe that these arguments are hypothetical and supposititious, rather than real. The strength of the proposition seems to be that, since by reason of after-occurring conditions, caused by the war, which nobody could have foreseen, the guaranty of the contractor has proven very burdensome, in that it not only has taken his capital, but has required excess to the full amount of the bond as well, the contract must be held to be unconscionable.

The argument that the outturn is proof that the parties were mutually mistaken as to price is of no value whatever, for, while it may readily be conceded that the surety company in executing the bond did not be-

284 F.—10

lieve it would be called upon to pay it, and that the contractor in executing the guaranty mistakenly believed he could perform, the proof, I think, overwhelmingly shows that the reason he did not perform was not because of conditions existing at the time of the contract, but after-arising conditions with which he was not able to cope. It is my opinion that the claimed inequities would all disappear if the matter was viewed in the light of proportional, rather than absolute, figures.

If the contract price had been $5,000, the bond $1,600, and the total cost $7,000, there would have been no contention, nor ground for contention, that the price was grossly inadequate, and the contract unconscionable thereby, though the proportion of, the bond to the contract and of the excess to the guaranty would be the same as here.

Equity does not consider absolute figures, and there is no more inequity in a million dollar loss than a thousand dollar loss, if the proportion of loss to the contract is the same in both cases.

I cannot therefore attach any importance to the fact, as a detached fact, that the cost of the work has run some $600,000 over the guaranty as suggesting any inequity which should relieve the surety company. On the contrary, the case is one in which the parties, desiring to build a causeway, and being unwilling to enter upon the enterprise unless they were assured that it could be built within the price named, made an agreement for its payment in the proportions as between each other fixed by them. In making this agreement absolute reliance was placed upon the assurance and obligation of a contractor of long experience in large works, and of a surety company of eminent solvency and wide experience, that they could and would perform, to such an extent that the county of Galveston obligated itself to pay all of the costs over and above that included in the guaranteed price. If, therefore, the situation in which the parties find themselves needs resort to equities on either side, I am of the opinion that the balance of equities lies in favor of defendants, in that they were induced to enter upon a work by a firm and fixed contract, and to assume the payment of sums which, but for the contract and agreement, they would not have assumed.

Much stress is placed by the complainants upon the so-called harsh and oppressive features of the contract, by whose terms the authority and control was left with the owners, and the risk all with the contractor.

These criticisms might well have been leveled at the contract when the parties were considering entering upon it, but, while the contract was a rigorous one to secure compliance with its terms, it was only rigorous and harsh in case it was rigorously and harshly applied, and the evidence not only does not point to any rigor or harshness, but, on the contrary, from the time the contract started until long after the work had been taken over by the owners, no criticism or complaint of any kind was ever made by the contractors as to the manner and method by which the work was being supervised and handled, and it was only after the litigation commenced to shape itself that these suggestions of the harshness and rigor of the contract were presented.

It is true that after-occurring facts, the inefficiency of labor and its high cost, due to the enormous inflation which war conditions and after war conditions brought on, made the performance of the contract with-

in its terms impossible, and worked a loss upon both contractor and surety, but equity follows the law, and ground for sympathy is not ground for equity. Nor is there any principle better recognized in the law of contracts than that he who contracts to do a thing must at his peril do it, and cannot be excused because of after-arising difficulties. Columbus Ry., Light & Power Co. v. City of Columbus, 249 U. S. 399, 39 Sup. Ct. 349, 63 L. Ed. 669, 6 A. L. R. 1648; Day et al. v. U. S., 245 U. S. 159, 38 Sup. Ct. 57, 62 L. Ed. 219; Carnegie Steel Co. v. United States, 240 U. S. 156, 36 Sup. Ct. 342, 60 L. Ed. 576.

[5] I must advert briefly to the contention made so much of in complainants' brief that the contract did not make complainant an independent contractor, but merely an agent. Whether this is so or not it is unnecessary to decide, for there is no provision of law or of equity which prevents an agent from making an agreement to perform work upon a fixed compensation and upon a guaranteed cost.

It has been the opinion, not only of jurists and law-writers, but of lawmakers, that in the long run public policy is better subserved by adherence to the principle that it is the duty of men to abide by their contracts, and that large figures and amounts do not change principles, and, while the skill, ingenuity, and vigor of counsel is admirable from the standpoint of an advocate, I find nothing in the record which would, on the ground of general unconscionableness or inequity, induce a chancellor to override the obligation voluntarily assumed by competent parties, to substitute for them a contract of his own.

The third point, in my opinion, is in reality no point for equitable cognizance, for, while I think it true, as contended by complainants, that the conditions actually found were not those which had been contemplated by the engineers or the parties in the precise form in which they were found, it is also true that the specifications made it clear that there would be some variations encountered, and while it is true that the parties considered, and I think correctly, that in changing the method of setting the foundations from sinking the foundations into clay to setting them on long and deeply driven piles. As to the particular piers in question, while there was a change from the plans, such a change was acquiesced in and accepted by the contractor; it did not amount to a serious or costly change, and was treated and understood by all parties as a substitute, clearly within the obligation, if not the terms of the contract, and one which gave no cause of complaint whatever, except as to the amount which in the ordinary course, and under the ordinary terms of the contract, might be allowed for it as extras.

[6] I am of the opinion, then, that for that change in the plans the contractor was entitled to an additional allowance. It is clear, however, that he never in the first place had any right to avoid the contract on account of it, and that, if he did originally have such right, he did, as conceded by complainant on page 23 of their reply brief, "by continuing in the work, affirm the contract as against the objection."

[7] This point is so elementary that it is not necessary to cite authorities. It is merely necessary to advert to the statement that in any court of equity, and particularly as practiced on the chancery side of the federal court, a person seeking relief from misrepresentations by

way of cancellation must proceed speedily, and cannot occupy the inconsistent position of going on with the contract, and at the same time claiming a right to rescind. The only dispute that ever existed on this point was that the contractor claimed about $13,000 for the change, and the owners' engineers allowed $900. The engineer had the right to determine these questions of what should be allowed, and, in the absence of fraud, that finding is conclusive on the contractor. See Holmes Co. v. Burton Construction Co. (C. C. A.) 267 Fed. 772.

The work proceeded for more than a year after this matter transpired, and at no time during the progress of the work or during the negotiations which led up to the cessation of it by the contractor was this matter ever mentioned by the contractor. It certainly presents no matter now which would appeal to a chancellor as a basis for relief.

[8] The sixth point presents the proposition that the owners wrongfully took out of the hands of the contractor the performance of the work, that the contract provided particular conditions upon which such action might be taken, and that none of these conditions existed.

The argument of complainants on this point is that, while it is true that the contract price had been practically absorbed, and that Larkin & Sangster, Inc., were in difficulties in the matter of proceeding, they never actually reached the point of insolvency, never had become incapable of completing the work, that the action of the owners was an assumption of these facts prematurely, and therefore constituted a breach by them, and that it would not do for the owners to set up the letters of Larkin & Sangster, and particularly the letter of June 9, delivered June 15, in which their inability to complete the work was asserted by them, as they were not definite expressions of the facts contained in them, but were merely letters written for and induced by negotiations then pending between the contractor and the owners for a new arrangement under which the work could be proceeded with.

As already stated in the opening statement of the case, I think it clear that, whatever the purpose of these letters was, they stated the facts, and nothing but the facts, that the company was insolvent and was unable to proceed, that all parties recognized these facts, and that, while it is undoubtedly true that there was disappointment on the part of Larkin & Sangster that some arrangement was not made by which they could continue to draw compensation, it was not in the contemplation of either the owners or the contractor that the contract should be completed by the contractor, as it had neither funds nor credit to proceed with. Certainly, under the facts as shown in this record, it presents no matter for equitable cognizance that the claim should be now asserted, more than a year after the facts transpired on which the claim is based, that advantage was taken of these contractors, when without funds or credit, and unable to proceed further, as they themselves stated over their own signature, and as the matters were, and when the surety company refused to take any part in moving the work forward, the owners for self-protection were compelled to and did take it over and proceed with it.

This disposes of the contentions made jointly by the contractor and the surety company, and leads to the conclusion that, whatever judgment the court may render in favor of defendants on their cross-action

against the surety company, no relief can be granted the contractor on the bill, and that judgment must go against it for the full amount sued for.

This brings me then to the two matters which the surety company relies upon as working a release of it from the obligation of the bond.

[9] Much is said in the briefs of both parties with reference to the standing here of this compensated surety and whether the rule of "strictissimi juris" applies. My own view of the matter is that those authorities which distinguish between the compensated and uncompensated surety are the soundest, that the reasonable philosophy of the law must be ultimately stated in terms of that distinction, and that the principle stated in 21 R. L. C. 1160 et seq., that the modern day surety must show some injury done before it can be absolved from the contracts which it clamors to execute is a sound one, and it is plain that some of the federal authorities follow that rule, among them Pacific County v. Illinois Surety Co. (D. C.) 234 Fed. 97, and American Bonding Co. v. U. S., 233 Fed. 364, 147 C. C. A. 300, and the same rule appears to be stated in 32 Cyc. 306. Against these authorities, however, the complainant cites some equally well considered, some as late. Among the first are American Bonding Co. v. Pueblo Investment Co., 150 Fed. 17, 80 C. C. A. 97, 9 L. R. A. (N. S.) 557, 10 Ann. Cas. 357, and U. S. v. American Bonding Co., 89 Fed. 925, 32 C. C. A. 420, and among the later Bench Canal Drainage District v. Maryland Casualty Co. (C. C. A.) 278 Fed. 67. While the Supreme Court of Texas seems to adhere to the strict suretyship rule without reference to the question of compensation. Hess & Skinner Eng. Co. v. Turney, 110 Tex. 148, 216 S. W. 621.

It is quite probable that the conflict of authorities in the federal court is apparent, rather than real, that upon the same state of facts as to compensated sureties the same rule would be applied in each circuit, and that the broad statement against the rule of "strictissimi juris" as to compensated sureties has been made necessary by an effort to obtain technical and unreasonable construction of bonds. I find no case from this circuit, and in the absence of such I am at liberty to follow my own course, which in this case will be to examine the matters in the light of the provisions of the contract and bond, giving those instruments a reasonable construction, neither unduly favoring nor discriminating against this surety.

[10] Approaching the two questions urged, then, in the order in which they are taken up, the first is point 4 of the brief, that the contract never become effective as to the surety because of the failure of the Galveston, Houston & Henderson Railroad Company to sign it until late in its performance.

Counsel for complainants have briefed this point with such prodigious assiduity and thoroughness, and presented it so earnestly and forcefully, that, though it presents an effort to escape liability by the assertion of a matter which had never any particular importance in this case, and therefore not only does not appeal to, but rather repels, a chancellor, I have, since equity follows the law, made a most careful and thoughtful examination of the point and the authorities presented,

in order to determine whether it from any viewpoint is more than specious, and presents a sound objection to this recovery. After this examination I have reached the conclusion that the citation from 13 C. J. 305, 306, cited on page 110 of complainants' brief:

"It is held in numerous cases that, where an instrument has been executed by only a portion of the parties between whom it purports to be made, it is not binding on those who have executed it. The cases so holding are usually those in which the parties executing the instrument would have a remedy by way of indemnity or contribution against the other parties named, which remedy is lost by the failure of such other parties to execute the instrument"

—correctly states the law, and that outside of this class of cases, in the absence of some express provision or some clear implication that the contract was not to take effect until it was signed, any contract which the parties have agreed to put in writing and sign is, when put in writing and signed by one of the parties to it, effective as to the others, unless the statute of frauds or some imperative rule of law makes signature prerequisite.

In this case there is no question of indemnity over, so that class of cases where the signature of all is necessary may be put aside. Nor is there any express agreement or clear implication that it was essential that all the railroads sign, for the contract as to the railroads provides for a lump proportion which the railroads are jointly and severally obligated to pay, and not for a specified part of the contract price chargeable against each railroad in severalty.

[11] Nor can the complainants bring their case within the other exception, that the statute of frauds or some imperative rule of law requires all the signatures, for there is no rule of law requiring a surety bond to be in writing, and, though much is said by counsel for complainants as to the statute of frauds, this contract does not come within it, because it is a contract which, though allowing 24 months as an outside limit, might have been, and by its terms was, authorized to be completed within a year or less. Thouvenin v. Lea, 26 Tex. 612; Warner v. T. & P. Ry., 164 U. S. 418, 17 Sup. Ct. 147, 41 L. Ed. 495; Lennard v. Lbr. Co., 46 Tex. Civ. App. 402, 94 S. W. 383.

[12] Leaving these exceptional circumstances out, the law is clearly settled, and in no case better than in Clegg v. Brannan (Tex. Sup.) 234 S. W. 1076, cited by complainants, that a contract which the parties have agreed to put in writing and sign is, when put in writing and signed by one of the parties, effective as to the other.

Apart from this matter, however, I am clearly of the opinion that upon other considerations the defense thus sought to be urged must be discarded.

[13] First, equity regards that as done which ought to have been done, especially as in this case, where, without any protest on the part of any person, the work was undertaken and set on foot by the contractor, and the signatures of all were finally affixed long before any trouble or litigation arose. Nor is it material here that at the time the Galveston, Houston & Henderson Railroad signed the contract the time for completion had passed, since the matter of claiming penalties for delay was one which lay with the causeway owners, and they do not seem ever to have exercised it. Nor would, in my opinion, there have

been any difficulty presented had the Galveston, Houston & Henderson never signed it, since the contract obligated each railroad to pay the full amount, and, had they failed to do so to an extent preventing performance by the contractor, it would have inured to the benefit of the surety company by causing its release since there would have been a breach in that case, not by the contractor, but by the causeway owners. Besides, the provision of the bond that nothing done or omitted by the owners would affect the surety obligation would, if necessary to resort to that provision, furnish a complete answer to the surety's case.

[14] The final point for the surety, that the change in the contract, discussed under point 2 with reference to the substitution of long for short piles, effected the release of the surety because made without its knowledge or consent, is completely answered by the terms of the surety bond and the settled provisions of law applicable thereto, and this whether the surety is a compensated or uncompensated one.

In the argument on this point counsel for complainants have treated the provision in the contract for obtaining the consent of the surety as though it were a provision in the surety bond or the contract that the owner must, before changes were allowed, obtain and file the consent in writing of the surety company, whereas, per contra, the contract not only does not contain such provision, but the bond expressly releases the owner from this or any other similar obligation. The provision of the contract upon which the complainant relies is:

"The contractor shall secure the consent in writing from its bondsmen to any change in this contract immediately upon receipt of written notice of such change from the supervising engineer, and before proceeding with the work in accordance with such notice, which written consent shall be filed with the supervising engineer."

The bond provided:

"It is expressly understood and agreed that no addition to or change in the work aforesaid, nor any overpayment or claimed overpayment by the railway companies to the contractor or those claiming by, through, or under it, and no extension of time or other indulgence, nor anything whatsoever done or omitted by the railway companies, shall operate to relieve the surety hereunder of its obligation by virtue of the premises, it being the absolute and unequivocal purpose of the parties hereto to assure to said railway companies the full and complete performance of the contract aforesaid, or the payment of all damages not exceeding the penal sum hereof which may be suffered in consequence of breach or partial breach of said contract."

These provisions in bonds are usual, reasonable, and enforceable, and no authorities are cited or can be which will obviate their binding effect.

On this point counsel for complainants say in their reply brief (page 36):

"The broad language of waiver or consent as contained in the surety bond must be taken in connection with the contract that was being guaranteed, and both instruments construed together in their entirety, and particularly is this true here where, if there were conflict, the general language would have to yield to the particular, so as to make effectual the specific provisions upon which we rely."

This argument proceeds on two assumptions, neither of which is sound: First, that the owners have agreed to obtain the consent in writing; and, second, that had they made such agreement, that agree-

ment would· override the waiver clause of the bond, in the face of its agreement that—

"Nothing whatever done or omitted by the railway companies shall operate to relieve the surety of its obligation."

The case of American Bonding Co. v. Pueblo Investment Co., 150 Fed. 20, 80 C. C. A. 97, 9 L. R. A. (N. S.) 557, 10 Ann. Cas. 357, cited by complainants, most clearly and correctly states the obligation of a surety with reference not only to the main, but to the collateral, covenants of his principal. In that case, on page 23 of 150 Fed., on page 103 of 80 C. C. A. (9 L. R. A. [N. S.] 557, 10 Ann. Cas. 357), it is said:

"The contract of suretyship is not that the obligee will see that the principal pays his debt or fulfills his contract, but that the surety will see that the principal pays or performs. [Citing cases.] The obligee does not represent to the surety that the principal will keep his covenants, but the surety holds his principal out to the obligee, and represents and promises to him that the principal will perform his agreements."

If this is a correct statement of the law, and it cannot be doubted, it certainly does not lie in the mouth of a surety, who has guaranteed its principal to the obligees, to claim a discharge from the contract by reason of the fault of its own principal. It is against the fault of the principal that the surety protects the obligee, and, if the principle asserted by complainants is sound, then no surety bond can be made which will be enforceable, because the enforcement of the bond only arises on account of the principal's breach.

It appearing that the contract provision relied upon by complainants was an obligation, not upon the owner, but upon the contractor, the breach of it by the contractor certainly cannot discharge the surety. But, if it be contended that any obligation under the terms of the contract with reference to changes was imposed upon the owners or their agent with reference to notice to the surety, it is, in language as clear as English can be put, expressed that no act of omission or commission on the part of owners can discharge the surety or defeat its liability.

It follows, therefore, that the bill should be dismissed for want of equity, and with costs, and that defendants should recover on their cross-action against the contractor the amount sued for, to wit, $652,-626.45, with interest, and against the surety company for the full amount of the bond.