CORPORATION OF PRESIDENT OF CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS v. HARTFORD ACCIDENT & INDEMNITY CO. et al. (THOMAS B. CHILD & CO., et al., Intervenors).

No. 6024. Decided Nov. 17, 1939. (95 P. 2d 736.)

Rehearing Denied, March 14, 1940.

298

*Bagley, Judd, Ray & Nebeker,* of Salt Lake City, for plaintiff and appellant.

*Albert B. Hall,* of Dallas, Tex., *Ingebretsen, Ray Rawlins & Christensen, Sidney N. Cornwall* and *S. J. Quinney,* all of Salt Lake City, for defendants and respondents.

*Henry D. Moyle* and *Paul E. Reimann,* both of Salt Lake City, for intervenors and appellants.

WOLFE, Justice.

This is an appeal by the plaintiff Church of Jesus Christ of Latter-Day Saints, hereinafter called the Church, and intervenor Thomas B. Child & Company, hereinafter called Child & Company, from a judgment of the District Court in favor of the Church as against defendant Inter-Mountain Marble Company, hereinafter called the Marble Company or Contractor, but in favor of the defendant Hartford Accident & Indemnity Company, hereinafter called the Surety, as to both appellants; and in favor of the Church as between the appellants. The Contractor has not appealed from the judgment against it in favor of the Church, nor from the judgment against it in favor of the intervenor Mt. Nebo Marble Company. The Church and the Mt. Nebo Marble Company were allowed recovery against the Contractor,

but no recovery was allowed in favor of any of the other parties.

This suit arose out of the building of a chapel in Washington, D. C., by the Church. In July 1931, the Church entered into an agreement whereby the Contractor was to furnish the exterior marble facing for the chapel from the quarries of the Mt. Nebo Marble Company in Utah, which quarries the Contractor leased. The finished marble was to be delivered in Washington on or before January 31, 1932. The cost was to be $111,600 with provision for payment of 90% of the total as the work progressed and for the remaining 10% after completion. The Surety gave bond in the amount of the contract price, warranting the faithful performance of the Contractor, for a money consideration. Delay in performance of the contract was waived by the Church. All of the marble was finally delivered, but the Church paid out $205,863.25, instead of $111,600, in the manner hereinafter set out. The Church sued the Contractor and its Surety for the difference. The Church alleged and urged that it complied with the contract; that the Contractor defaulted; that it notified the Surety of the Contractor's default; that the Surety denied liability and refused to take over the work; that therefore the Church "did secure at its [own] expense, finished marble facing [from this same quarry, the only one known where such marble could be procured] sufficient to complete its said Chapel in accordance with said contract and specifications, to plaintiff's loss and damage in the total sum of $99,328.78".

The Surety counters with the defense that there was no default on the part of the Contractor, but that from the beginning to the time the last marble was delivered there was no cessation of work and no change in contractors nor in method, manner or procedure in handling the marble or the payments; that the Contractor therefore fully performed its contract; that the over-payments by the Church to the Contractor must be considered as loans to enable the Contractor to complete its contract just as if a bank or sepa-

rate party had advanced the money to complete the contract. The Surety also contends that the Church departed from the terms of the contract and such failure to comply releases it as Surety. To this last proposition the Church has two answers: (1) the Surety by its own bond agreed that neither alterations in the terms of the contract nor in the work done under it should release the Surety; (2) that even if there was non-compliance, under the later decisions of the courts, a paid surety is not released absolutely but only to the extent to which it has been prejudiced or has suffered damage by the non-compliance. The district court accepted the position of the Surety. Appellants have assigned numerous errors based on the conduct of the trial, the findings of fact and conclusions of law. Pertinent facts will be more fully presented as an examination of these assignments requires.

We shall first consider the question whether the Church failed to comply with the contract and if so whether the Surety is totally released or only to the extent to which it was damaged by such non-compliance. At this point there should be introduced to the reader the salient sections of the contract in regard to which non-compliance is asserted, and also the provisions of the bond. The contract, dated July 25, 1931, provided:

"Article 1. That the Contractor shall at his own cost and expense, furnish all the materials and all the labor, plants, tools, implements, power, apparatus, tackle, appliances, cartage and transportation, etc., required to fully and completely manufacture and deliver F.O.B. Cars, Washington, D.C., all the exterior marble facing in accordance with the drawings and specifications.   *   *   *

"Article 3. That the Owner shall pay to the Contractor in current funds for the full performance of the contract One Hundred Eleven Thousand Six Hundred and no/100 ($111.600.00) Dollars, subject to additions and deductions as provided in the General Conditions of the Contract and shall make payments on account thereof as follows:

"On the first of each month, ninety (90%) per cent of the Architect's estimated value of all finished material delivered F.O.B. Cars, Washington, D.C., or of the actual value of same as shown by presented, receipted bills, less the aggregate of previous payments and the remaining ten (10%) per cent fifteen (15) days after satisfactory completion and acceptance of the entire work.   *   *   *"

The bond, executed July 31, 1931, provides, so far as material here:

"Whereas, the Principal has, by means of a written agreement, dated July 25th, 1931, entered into a Contract with the Owner for the furnishing of the exterior marble facing work for the Washington, D.C., Chapel to be built in the City of Washington, District of Columbia, a copy of which agreement is by reference made a part hereof.

"Now, therefore, the Condition of this Obligation is such that the Principal shall faithfully perform the Contract on his part, and satisfy all claims and demands, incurred for the same, and shall make prompt payment to all persons supplying labor and materials used in the prosecution of the work provided for in such Contract and shall fully indemnify and save harmless the Owner from all cost and damage which he may suffer by reason of failure so to do, and shall fully reimburse and repay the Owner all outlay and expense which the Owner may incur in making good any such default.

"If said Principal and Surety shall perform as aforesaid then this Obligation shall be null and void; otherwise it shall remain in full force and effect.

"Provided, that any alterations which may be made in the terms of the Contract, or in the work to be done under it or the giving by the Owner of any extension of time for the performance of the Contract, or any other forbearance on the part of either the Owner or the Principal to the other shall not in any way release the Principal and the Surety or Sureties, or either or any of them, their heirs, executors, administrators, successors or assigns from their liability hereunder, notice to the Surety or Sureties of any such alteration, extension or forbearance being hereby waived."

In order to contrast the manner in which the Church actually dealt with the Contractor, with the manner contemplated by Article 3 of the Contract, certain detailed facts now become material. The Church paid for the entire marble $205,863.25, represented by fifty payments. The first payment was made on July 13, 1931, before the date of the Contract. The last was made on March 14, 1933, for marble which was delivered more than a year after the date on which the contractor was required to deliver all the marble in Washington (January 1, 1932). The Church extended the time for completion, but the Surety claims no release

on that account because its bond provided that such extension should not release it.

The payments were not made on the first of each month, as provided by the contract, nor was 10% of each or any payment retained until fifteen days after the satisfactory completion and acceptance of the entire work. The payments were made, not on the architect's estimated value of finished material *delivered* in Washington, nor on presented and receipted bills showing expenses incurred or paid for the quarrying and fabrication of marble delivered in Washington, but were made more often than monthly and on the strength of expenses incurred or paid for marble in process whether or not it was delivered in Washington, largely according to the needs of the Contractor to carry on work. In short, the payments were largely advances on marble *to be delivered*, rather than only on marble actually *delivered*. Apparently, however, there was always marble in process which marble at all times represented a value in materials and labor greater than the payments made by the Church up to that time (excluding the two payments made before the contract was signed).

The district court in finding No. 7 said that "each payment was made without any regard to the proportion of the contract price which the amount of the marble which had been furnished at the time it was made bore to the amount of all marble required by the contract." At this time it may be said that the second alternative settlement provided in Article 3 does not seem to require such proportion to be maintained. The provision is not ambiguous and contemplates payment according to bills presented showing the expenditures making up the value of *delivered* marble whether or not in excess of its value proportionate to all the marble required. *Southern Real Estate & Financial Co.* v. *Bankers' Surety Co.*, 276 Mo. 183, 207 S. W. 506; *Finne* v. *Maryland Casualty Co.*, 102 Wash. 651, 657, 658, 173 P. 501; *Lena Lumber Co.* v. *Brickhouse*, 173 Ark. 348, 292 S. W. 1007; *Milavetz* v. *Oberg*, 138 Minn. 215, 164

N. W. 910, 913; *Smith* v. *Molleson,* 148 N. Y. 241, 42 N. E. 669; *Hileman & Gindt* v. *Faus,* 178 Iowa 644, 655, 656, 158 N. W. 597; *Burr* v. *Gardella,* 53 Cal. App. 377, 200 P. 493. In this respect the contract was not exceeded. But in paying bills and payrolls other than on delivered marble, and in failing to retain the 10%, Article 3 was not complied with. The bond provided that "any alteration which may be made in the terms of the contract or in the work done under it" shall not release the Surety. The plaintiff treats the clause as if the Surety had agreed to forego any right to defend against any prejudice or damage which the change caused it; that is as if it had agreed in advance that the owner might recover in full for any damages suffered because of the Contractor's failing to perform the contract *as changed.* The Surety counters by contending that the plaintiff did not plead a breach of an altered contract but only of the original contract and hence its claim of damage from breach of an altered contract is not within the issues. The real situation is that the waiver provision in the surety bond was to the effect that alterations in the terms or in work done under them or extension of time of performance or any other forbearance on the part of either the Owner or the Principal (Contractor) "shall not in anyway *release* the Principal and the Surety or Sureties * * * from their liability" under the bond. The provision was to avoid the severity of the common law rule which already has been relaxed by decisions in many states, including ours. The trend of modern decisions which this provision of the contract recognizes is that a departure from the terms of the contract, faithful performance of which the surety guaranteed, should not fully release the surety. The provision does not mean that if the surety is damaged or injured by the departure or alteration, it cannot defend pro tanto for the damage or prejudice suffered by such alteration. A provision that the surety shall not be released in any way from liability cannot be converted into a defense by the owner against a claim for damage which the alteration or change in the work done under the contract

may have caused the surety over and above the liability it would have had to pay if the change had not been made. The *waiver provision does not include a breach of the contract by the owner;* but, as we view the matter, it is not necessary to determine whether the departure of plaintiff and Contractor from the terms of Article 3 of the contract is an alteration by conduct or a breach. We think that even if there was a breach by the Owner in regard to the matter of premature payments or failure to retain the percentages, the Surety would not be totally released, but could defend only to the extent that its liability had been increased by such breach. There may be some breaches that work a full release of the surety but the ones here set up as doing so are not such.

It is admitted that the authorities are in conflict on the question of whether a corporate surety is fully released by a breach of the owner. Many of the older cases and a few of the newer ones hold that a breach, whether prejudicial or not, entirely releases the surety. *Prairie State Bank* v. *United ed States,* 164 U. S. 227, 233, 17 S. Ct. 142, 41 L. Ed. 412; *Justice* v. *Empire State Surety Co.,* 3 Cir., 218 F. 802; *Fidelity & Deposit Co.* v. *Agnew,* 3 Cir., 152 F. 955; *Inland Navigation Co.* v. *American Surety Co.,* 190 Ky. 504, 510, 227 S. W. 809; *First Nat. Bank* v. *Fidelity & Deposit Co.,* 145 Ala. 335, 40 So. 415, 5 L. R. A., N. S., 418, 117 Am. St. Rep. 45, 8 Ann. Cas. 241. Other cases hold that only where prejudice is shown is the surety fully released. *Fortworth Ind. School Dist.* v. *Aetna Casualty & Surety Co.,* 5 Cir., 48 F. 2d 1, 77 A. L. R. 229; *James Black Masonry & Contracting Co.* v. *Nat. Surety Co.,* 61 Wash. 471, 112 P. 517, 519; *Jersey City Water Co.* v. *Met. Construction Co.,* 76 N. J. L. 419, 423, 69 A. 1088. Those cases cited by respondent where a personal or accommodation surety was held fully released are not in point.

Numerous other cases hold that variations in the method and amount of payment or failure to retain a specified percentage do not release the surety unless the surety shows prejudice and the release is then only to the extent of the

prejudice. *Standard Asphalt & Rubber Co.* v. *Texas Building Co.*, 99 Kan. 567, 162 P. 299, L. R. A. 1917C, 490; *Martin* v. *Robinson*, 127 Kan. 100, 272 P. 149; *Manhattan Company* v. *United States Fid. & Guar. Co.*, 77 Wash. 405, 411, 137 P. 1003; *Harlan Fuel Co.* v. *Wiggington*, 203 Ky. 546, 553, 262 S. W. 957; *Finne* v. *Maryland Casualty Co.*, supra; *Maryland Casualty Co.* v. *Eagle River School Dist.*, 188 Wis. 520, 205 N. W. 926; *Harvey* v. *George*, 207 Mich. 667, 175 N. W. 140; *Trustees of Methodist Episcopal Church* v. *Equitable Surety Co.*, 269 Pa. 411, 112 A. 551; *Nat. Surety Co.* v. *Haley*, 58 Okl. 263, 159 P. 292, 297; *Southern Real Estate & Financial Co.* v. *Bankers' Surety Co.*, Mo. Sup., 184 S. W. 1030, 1035; *Village of Canton* v. *Globe Indemnity Co.*, 201 App. Div. 820, 195 N. Y. S. 445; *United States Fidelity & Guaranty Co.* v. *Trustees of Baptist Church*, Ky., 102 S. W. 325; 50 C. J. 120, 121.

This conflict in the cases is noted or commented on in Williston on Contracts, Rev. Ed., Sections 1242, 1243; Stearns, Law of Suretyship, 4th Ed., Sec. 76b; 21 R. C. L. 1014, 1162; 5 L. R. A., N. S., 418 (note); Arant, "Rationale of The Rule That an Obligee's Premature Payment Discharges His Surety", 80 Univ. of Penn. Law Review 842-857; 42 Harvard Law Review 838 (note). But the trend of the later well-considered cases where compensated surety companies are involved is toward releasing the surety only to the extent of his prejudice.

Dean H. W. Arant of the Ohio State University Law School has also found an evolution in the suretyship cases, so far as premature payment is concerned, from the case of *Calvert* v. *The London Dock Co.*, 2 Keen 638, decided in England a hundred years ago, to the present when personal sureties in building contracts have largely disappeared. In his article above referred to, he says:

"At first, the courts very generally followed the rule laid down in Calvert v. The London Dock Company and a few courts very recently have taken the same view, relying upon some one of the reasons urged in the decisions referred to above. A good many courts, however, refuse to accept this argument when offered in behalf of a corporate

compensated surety. Their reasoning usually begins with a statement that a compensated surety is an insurer and, having thus tagged the defendant, the case is regarded as withdrawn from the category of suretyship. It is then concluded that such a surety is not discharged unless the premature payment causes it injury. Some courts go so far as to hold that the burden of proving the existence and extent of such injury is upon the surety, but their language often suggests that, if any injury is shown, even such a surety's discharge is total. Nevertheless, actual decisions are making it increasingly clear that this implication is not intended and that the extent of the injury proved measures the compensated surety's discharge." pp. 845, 846.

This court, in *M. H. Walker Realty Co.* v. *American Surety Company,* 60 Utah 435, 478, 211 P. 998, 1015, 1016, has indicated, although not with reference to premature payments, that it does not favor the release of a compensated surety company except to the extent of its prejudice. This was there declared to be the rule of the "modern authorities relating to paid sureties". As applied in this case, we hold that failure to retain the 10% and payment of vouchers on all marble instead of delivered marble only, did not release the surety entirely but only to the extent that it was prejudiced thereby.

*Paxton* v. *Spencer,* 71 Utah 313, 325, 265 P. 751, seems partially contrary to this holding, since in that case we held that failure to retain the 10%, although not releasing the surety completely, did release it to the extent of the 10%. But in that case the court found damage to the surety in the failure to retain the 10%. At page 325 of 71 Utah, at page 756 of 265 P., it is stated:

"The authorities are not agreed as to whether the failure to retain a percentage of the estimates under a bond requiring such retention. is a full release of the surety or a release pro tanto of any damages sustained by the obligor of the bond. * * * There is nothing in this record to indicate or to suggest that the surety sustained any greater loss than its deprivation of the 10 per cent by the failure of the principal contractors to retain such amount from the payments to the subcontractors." .

But if *Paxton* v. *Spencer,* supra, meant to hold that in all cases as a matter of law the surety was damaged by failure

to retain the 10% even though it was necessarily and reasonably expended on the contract, we think the decision failed to follow through and is against the weight of authority and the actualities of the situation.

In the case at bar the parties varied the method of payment, basing it on expenditures for work done on all marble in process, instead of on expenditures to fabricate and transport *delivered* marble.

The payments made by the Church fall into four categories: (1) Those made for work done before the contract was signed—that is, before July 25, 1931 ($3,595.40) ; (2) Those made after the contract was signed but before any marble was delivered ($9,876.08) ; (3) Those made between the time the first marble was delivered (November 7, 1931) and the time when a total of $112,824.99 or $1,029.99 more than the increased contract price of $111,795 was paid (August 1, 1932) ; (4) Payments made after August 9, 1932 when the alleged default was declared. These categories need separate treatment.

The sum falling under the first category, amounting to $3,595.40 (except such part which may have been for the period between July 25 and August 1, 1931, not segregated), cannot be charged to the Surety. These were not advancements pursuant to the contract but loans purely, made before the contract was executed.

Payments in the second and third categories, including the $1,029.99 of the third category, were all advancements under the contract. The apparent over-payment of $1,029-.99 was really not such because if the $3,595.40 (not allowed) is subtracted from the contract price of $111,795, there remains $2,565.40 which the Church had to pay on the contract price.

The next question: Was there a default or abandonment by the Contractor? If not, it faithfully performed, and the Church cannot recover. It is the contention of the Surety that there was no lapse or cessation of the work from beginning to the end and that it was performed by the Contractor from beginning to the end under the

same methods and same manner of payment after the $111,-795 had been paid as before, hence there was no default and no abandonment; that the Contractor performed; that the Church was its financier advancing payments as if some outside party had enabled it to proceed by financing it. This contention requires a setting forth and consideration of additional facts bearing on this phase of the case.

The evidencee shows that although the Contractor never stopped its workmen there was a time when it was unable to proceed with the contract. That was in the first part of August, 1932, when the Church had paid the Contractor $112,269.99 (including the $3,595.40 paid before the contract was signed but only $109,229.57 in pursuance of the contract). One of the architects, Mr. Young, testified that before certifying the request which was paid August 1st he discussed the matter with a representative of the Contractor and told him they would have to contact the Owner (Church) before he could certify for further payments. This was done. The matter of making further payments, in excess of the contract price, was referred by the Church to its attorneys, counsel here. Counsel notified the Surety's local claims attorney of the situation and at his suggestion wrote him a letter for transmittal to the San Francisco office. This letter stated that "we are desirous of not stopping the work, which would only increase the damages under the contract." It further informed the Surety that unless immediate attention was given the matter it would "be necessary for the owner to make an election under its option as to how and under what conditions it will continue the work at your expense as in the bond provided." It further appears by the letter that there was a payroll for work on the marble of $7,000 to meet on the 13th of August.

A few days later a conference was held attended by the architects, Young and Hansen, by Messrs. Andrew and Hardy for the Contractor, by Mr. Judd as counsel for the Church, and by the local claims adjustor and the San Francisco representative of the Surety (the local agents of the

Surety were present at an afternoon meeting in addition to the above).

Prior to this meeting and after the writing of the letter of August 9th, Mr. Judd called Mr. Andrew (representative of the Contractor) into his office and discussed with him the entire matter of his failure to deliver all the marble when the contract price was exhausted, and Mr. Judd "thinks" he used the word "termination" or "terminate the contract," and reference was made to giving the bonding company its privilege to go forward. Mr. Andrew, it was testified, said he appreciated the existing circumstances and realized that he would have to do whatever was necessary. Mr. Van Tassel, representative of the Surety, himself admitted that he had told Mr. Judd, attorney for the Church, at the end of the conference "that I would decline to do anything about it on the ground that we were not liable," and the Surety did fail to do anything about it. The Surety took the position that the Church had breached the contract and that the Surety was released. It was wrong in assuming that it was released.

While the evidence of the termination of the status of Owner and Independent Contractor and a supplanting of it by a status of Owner furnishing the marble to itself by taking over the Contractor's organization is not as vivid as it might be, nor the break between one status and the other dramatized by any outstanding features, we think the evidence cannot lead to any other conclusion. At least the Surety, in view of its conduct, cannot urge that there was not a termination of the contract. Certainly the Marble Company was financially unable to continue. It threw up its arms and admitted its inability to proceed further without financial help at a time when more than the complete contract price had been paid. The Church had half the marble on the building. It could not change marble in the middle of the job. This quarry was the only one where the marble could be procured. Child & Company, as appears in this case, was being held up and put to extra expense be-

cause of delay. Marble, therefore, had to be kept coming. The Contractor's organization was intact. For the Church to set up a new organization would have caused more delay and perhaps been less economical. Mr. Young, the architect, testified that he had investigated the matter of having a very large marble fabricating plant in Baltimore assume the contract, and also considered shipping the raw material to Los Angeles for fabrication. Both schemes proved economically unfeasible. It was, therefore, under the peculiar circumstances of this case, reasonable and natural that the Church should use the Contractor's organization to continue with the work.

The Surety is hardly in position to say there was no default because, when it was notified by the Church that there was a default, it made no denial of default but based its assertion of non-liability on its release due to a claimed breach by the Church. It is because of the Surety's attitude of washing its hands of the matter and refusing to take over that the Church was put in the position where it had to enter into arrangements to keep the marble coming. How, under such circumstances, may the Surety now question the happening of a default and assert that there was no termination of the contract? Something in the nature of an estoppel closes the mouth of the Surety to question too closely the legal nature of the relations between the Church and the Contractor after the Surety refused to have anything to do with the matter. It is quite true that the Church might have more definitely delineated the change in status by requiring the board of directors of the Marble Company to pass proper resolutions permitting it to take over, or the Church might have assumed more definitely the status of an employer by putting the managers or superintendents and employees on its own payroll instead of only putting its auditor Mr. Wagstaff on the job to audit payrolls. But the Surety, by denying liability and walking off, not because it then claimed that there was no default by the Contractor but because it claimed that the Church had breached the

contract, is not in a position to assert that the Church was not acting on its own account pursuant to a default after August 9, 1932. Failure to perform at the price agreed upon is a breach of the contract. *Johnson* v. *Vogel*, 208 Iowa 44, 48, 222 N. W. 864; *W. H. Putegnat Co., Inc.*, v. *Fidelity & Deposit Co.*, Tex. Com. App., 29 S. W. 2d 1004, 1006; *Elliott* v. *Garringer*, 27 Ohio App. 362, 364, 161 N. E. 287.

The Contractor offered no solution but merely admitted the necessity of doing whatever the Church required. When the Surety refused to take over, the Church was faced with two alternatives: suit against the Surety or completion of the contract with a claim against the Surety. The slow culmination of this litigation demonstrates the wisdom of the choice that was made. The Church now seeks to be indemnified under the definite provisions of the bond. The claim must be allowed. It was error to find that the contract was faithfully performed by the Contractor when it failed to perform at the contract price; and the bond provides indemnity for such a failure. This liability is not altered by the fact that the same Contractor's organization was allowed to continue to furnish marble since it was decided, after investigation, that the arrangement was the most economical and expedient. The Church took the safeguard of having its own auditor check the operations and expenditures, but this was not so important in showing a new arrangement as it was in facilitating proof by the Church that money paid the Contractor was put into marble for the Washington chapel. The matter of whether all of the money paid by the Church went into the work before and after default will be the main subject of inquiry on the retrial.

We have not found or been referred to any authorities precisely analogous, but authority for allowing recovery, on this phase of the case, is found in *Church of the Immaculate Conception* v. *Curtis*, 130 Minn. 111, 153 N. W. 259; *Galveston Causeway Const. Co.* v. *Galveston, H. & S. A. Ry. Co.*, D. C. Tex., 284 F. 137, 148, affirmed 5 Cir., 287 F. 1021,

certiorari denied, 262 U. S. 747, 43 S. Ct. 503, 67 L. Ed. 1212; *Hileman & Gindt* v. *Faus*, 178 Iowa 644, 654, 158 N. W. 597. The Surety here relies on three cases which reach a result contrary to that reached by us: *Hill County* v. *Bryant & Huffman*, 118 Tex. 359, 16 S. W. 2d 513; *McGregor & Henger* v. *Escajeda*, Tex. Civ. App., 216 S. W. 398; *Gato* v. *Warrington*, 37 Fla. 542, 19 So. 883. But none of these cases is analogous to the instant case in the particulars essential to disposition of this branch of our inquiry. In *Hill County* v. *Bryant & Huffman*, supra, the bond was one required by statute to insure only the faithful service of a road supervisor on road construction work and did not cover an overpayment by the county which it sought to recover; likewise, in the *McGregor & Henger* case, there was no promise by the surety to indemnify the owner, and the principal's duty to make good an overpayment was held based on an implied promise. The same is true of *Gato* v. *Warrington*, supra. There was no promise by the surety to indemnify the owner against liens for labor done and so the owner was denied recovery against the surety for the amount of such liens. In the case at bar the agreement made by the Surety *included indemnity of the Owner for loss arising from defaults of the Principal without limitation as to type of default.*

The Surety contends, however, that even if there was a basis for holding it responsible the Church has not given the Contractor notice which is made a condition precedent to recovery by the contract. Section 36 of the Specifications of the Contract provides for notice to the Contractor as follows:

"If the Contractor should * * * be guilty of a substantial violation of any provision of the contract, then the Owner, upon the certificates of the Architect that sufficient cause exists to justify such action, and without prejudice to any other right or remedy and after giving the Contractor seven days written notice, terminate *the employment of the Contractor and take possession of the premises and of all materials, tools and appliances thereon* and finish the work by whatever method he may deem expedient. * * * " (Italics added.)

The court's finding of fact that such notice was not given is not questioned; but it made a conclusion of law that such notice to the Contractor was, "as to the Surety, a condition precedent" to taking possession and completing the contract at the Surety's expense. The Church contends that this provision was for the Contractor's benefit only and that it waived notice.

The contract and bond do not provide for any notice to the Surety. It is arguable that, in view of such failure, there should be an implication that notice to the Contractor was for the benefit of the Surety. But sureties in building contracts are not entitled to any notice of default unless the agreement specifically provides therefor. *Maryland Casualty Co.* v. *Eagle River U. F. H. School Dist.*, 188 Wis. 520, 205 N. W. 926, 929; Williston, op. cit., Sec. 1237; Stearns, op. cit., Sec. 6; 50 C. J. 170.

There is, however, authority for the position that a contractual provision for notice to the contractor in case of default is a condition precedent to action against the surety. *Cincinnati, N. O. & T. P. R. Co.* v. *Fidelity & Deposit Co.*, 6 Cir., 296 F. 298; *United States Fidelity & Guar. Co.* v. *Sutherlin Construction Co.*, 5 Cir., 263 F. 360; *Harris* v. *United States Fidelity & Guar. Co.*, Mo. App., 213 S. W. 151. But in those cases the contractor was not willing to discontinue work under the contract and claimed a right to continue. It is not necessary for us to decide whether, under such circumstances, notice of default to the contractor is a condition precedent to action against the surety, since in the instant case the Contractor admitted its default, inability to continue the work, and willingness to do what the Church required of it. These circumstances are tantamount to a waiver and the notice is not necessary to hold the Surety. *Galveston Causeway Const. Co.* v. *Galveston H. & S. A. Ry. Co.*, supra; *Church of the Immaculate Conception* v. *Curtis*, supra; *George A. Fuller Co.* v. *Doyle*, C. C. Mo., 87 F. 687, 692.

The district court found that "the necessary and reasonable cost of performing the contract was not in excess of the contract price." This was assigned as error by the Church, as was the admission of the testimony of the witness, James M. Carney, who testified that a reasonable price for furnishing the marble required under this contract was $102,223, including freight. This assignment becomes important since the district court must determine the prejudice, if any, to the Surety and the amount spent by the Church *in completing* the contract which can be recovered from the Surety.

The Church notified the Surety of the default and requested it to complete the contract which the Surety declined to do. Had the Surety wanted to hold costs to the minimum in its own interest, it should have assumed performance and held the Church for any items it had improperly paid. Instead, it refused to perform and the Church proceeded, after investigating other possibilities, in what it contends was the most economical and efficient way available. The Surety suggested no cheaper way, and it does not do so now, but relies on the estimate of a witness to overcome testimony of actual expenditures. This evidence was not admissible. The issue after default and refusal of the Surety to take over is not what the remainder or the whole of the job could reasonably be done for at a gross figure. It is not a matter of competitive bids through evidence. The issue is whether the Church, after the Surety refused to take over, made the expenditures in completing the contract in good faith. It is not the reasonable but the actual costs made in good faith. *Baer* v. *Sleicher,* 6 Cir., 153 F. 129, 132.

The obligation of the bond is not to pay what some jury may consider the reasonable cost of completing the contract but to "fully indemnify and save harmless the owner from all *cost* and damage which he may suffer by reason of the failure so to do and shall fully reimburse and repay the owner *outlay* and *expense* which the owner may incur in making good such default." (Italics added.) In *Prudence*

*Co.* v. *Fidelity & Deposit Co.*, 297 U. S. 198, 206, 56 S. Ct. 387, 389, 80 L. Ed. 581, the court said:

"To show the loss sustained from finishing the work, it proved the actual cost, as by the express provisions of the bond it was at liberty to do."

If the Surety can show waste and extravagance in any items in completing the job, or lack of good faith, it is at liberty to do so. The duty of the owner toward its contractor's surety is to endeavor in good faith to complete the job without unnecessary expenses. It cannot disregard expense or heedlessly spend on the belief it will be indemnified. To the same effect see *Schmidt Bros. Const. Co.* v. *Raymond Y. M. C. A.*, 180 Iowa 1306, 1317, 163 N. W. 458, 462, where it was said that the owner had the right to expend such sum as was "fairly and reasonably necessary" to complete the structure and that "it is not shown that appellee did not expend the amount claimed upon the building." In *Clark* v. *Fleishmann Vehicle Co.*, Sup. Ct., 187 N. Y. S. 807, 813, it was said, "It is not permissible to show by the testimony of experts what would be a reasonable amount to complete the work, or any part thereof, and if such testimony is admitted it has no probative force." All the owner need first do to make a case is show the money he expended and that it was all expended to complete the contract and expended in good faith. He does not need to show that the expenditures were reasonably, necessarily, prudently, or wisely made. If the Surety thinks they were not, he may show wherein they were unreasonable and the fact-finder must judge on the evidence. *Massachusetts Bonding & Ins. Co.* v. *John R. Thompson Co.*, 8 Cir., 88 F. 2d 825. It is not permissible to show by an expert a gross estimate of what would be the reasonable amount to complete the work. The defendant must show wherein the reasonable expenditure was exceeded.

The above is the rule which pertains to moneys expended after the surety refuses to take over. But this case differs

from the cases cited above in that here, before the default of the Contractor, there was a violation of the contract by the Owner, the Church. If advances had not been made, the Contractor. might have either defaulted very much sooner because of earlier financial difficulties or the contract price would have paid for more delivered marble. It is a speculation as to which might have happened. It has been left open for the Surety to show if and wherein he has been prejudiced by the Church's violation. But if the contract had been observed by the Church and the Contractor had continued, only that amount would have been paid against delivered marble which represented money's expended for producing and delivering that marble. Therefore, as to the expenditure of the contract price before the Contractor's default, it is only fair that the Church be required affirmatively to show that all the money it advanced was necessarily and reasonably spent in producing the marble. The position of the Church is, as to its violation, that in any case the advances would all have ultimately been expended for delivered marble. But to establish this position, it should be required to show that such advances were necessarily and reasonably spent in producing and transporting marble. This may require the determination of how much of the life of the machinery was used in the fabrication of this marble. Thus as to the expenditures made under the second and third categories above mentioned the Church has the burden of proving that they were reasonably and necessarily expended in production and transportation, but as to those expenditures made after the Surety refused to take over, the rule is as heretofore stated.

We do not mean to say that, in certain cases where the owner has made advances in the manner herein made, it would not, as far as concerns the ascertainment of the damages which the surety may have suffered, be treated as a financier of the contractor and that credits for 90% of the cost of delivered goods would be allowed as the only sums properly paid in pursuance of the owner's obligation, the

remainder being treated as a loan, payment of which the surety did not guarantee. But in this case all advancements made out of time, including the 10%, if they were reasonably and necessarily expended in fabrication of marble, were for the benefit of the Surety in its taking over or, in case of its default, for the owner's benefit in taking over. Since in this case there was no other place to get the marble, all such sums reasonably and necessarily expended on marble must have lessened to that extent the cost of completing the job. Requiring the Church to prove that all sums advanced up to default were reasonably and necessarily expended in fabrication of marble in effect places on the Church the burden of showing that the Surety was not injured by such advancements. If the advancements were all necessarily and reasonably expended, there was applied at one end, by virtue of these advancements, moneys which ultimately, after default, the Owner or Surety would have had to apply on the other end to get to the same point. The advancements were used for the fabrication of a unique and unduplicable type of building material and, therefore, by compulsion, for the fabrication of this very and no other material. The Church in effect took over the fabricating plant of the contractor and found there marble in the process of fabrication for which its advancements had paid. The costs of fabricating this marble, therefore, were already paid for by the advancements out of time and cut down to that extent the cost of completing the contract.

As to the Intervenor: We fail to see any reason why Child & Company was permitted to intervene. There is "no matter in litigation"—no fund or res. If the Intervenor has an interest in the success of either or any party to this litigation "it is not a legal interest". There is no outcome in this suit brought by the Church which would in any way prejudice the Intervenor's right to bring an independent suit or even establish a precedent against it. Intervention may serve to prevent circuity or multiplicity of action, but that alone is not sufficient reason for in-

tervention. However, Child & Company is here with issues formed and no objections assigned. We shall consider its points as if it had been properly admitted as an intervenor.

The Intervenor claims against the Church, the Contractor, and the Surety. The district court denied its recovery against any of them.

The claim against the Church is on the theory that there was an implied liability to furnish the marble on time to enable Intervenor to proceed expeditiously according to its contract. Where the owner is to furnish materials or perform certain preliminary construction as a condition precedent to the pursuance by its contractor of a contract to perform within a certain time and the contractor relies on such owner to perform in time and is damaged by reason of his failure, he may recover. *Arkansas Bridge Co.* v. *Kelly-Atkinson Construction Co.*, 8 Cir., 282 F. 802; *Louisville & Nashville R. Co.* v. *Hollerbach*, 105 Ind. 137, 5 N. E. 28; *Jonathan L. Booth* v. *Spuyten Duyvil Rolling Mill Co.*, 60 N. Y. 487; *City of Chickasha* v. *Hollingsworth*, 56 Okl. 341, 155 P. 859.

But in this case several matters preclude recovery against the Owner. In the first place, the contract with the Marble Company was made on July 25, 1931; the contract with the Intervenor on September 28, 1931. The Intervenor knew of the contract with the Marble Company, knew that that marble could not be supplied from anywhere else in the world, and knew that the material must be furnished by the Marble Company, or by someone operating for it. Under such circumstances there was no implied condition that the Owner would furnish the marble per schedule. It was helpless to furnish the material itself and had to rely on the Marble Company to do so. This the Intervenor knew or should have known. The Intervenor took its chances with the Owner that the Marble Company would perform.

Secondly, the General Conditions of the Proposal and

Specifications were made part of the agreement between Child & Company and the Church. Article 6 of the General Conditions provides:

"Mutual Responsibility of Contractors:

"Should the Contractor cause damage to any other person employed on the work, the Contractor agrees upon due notice to settle with such person by agreement or arbitration if such person will so settle. If such person sues the Owner on account of any damages alleged to have been so sustained, the Owner shall notify the Contractor, who shall defend such proceedings at the *Owner's expense* and if any judgment against the Owner arise therefrom the Contractor shall pay or satisfy it and pay all costs incurred by the Owner.

"The Contractor if damaged by any person held to the Owner by stipulations such as the above, agrees to settle with such person by agreement or arbitration *and in no case to sue the Owner on account of such damage."* (Italics added.)

Paragraph 72 provides in part:

"The Owner is not to be held responsible for any damage incurred by the Contractor through the fault of any other Contractor employed by the Owner. Should the Contractor be delayed in the prosecution of the work by reason of the above cause, or through the Owner, the time of completion shall be extended for a period equivalent to the time lost. \* \* \*"

As between Child & Company and the Church these provisions constitute an agreement by Child & Company not to sue the Church for damages due to delay caused by another contractor, its remedy being to secure an extension of time in order to avoid liability for failure timely to complete the work. In certain old decisions courts have held that an agreement not to sue could not be set up as a defense to an action for damages. If the party did sue and obtained damages, the party he agreed not to sue could only sue for the breach of the contract not to sue, and could recover back the damages and other costs incurred because of suit. But disregarding an agreement not to sue results in circuity and multiplicity of actions which we shall avoid by denying Child & Company's action against the· Church. Williston, op. cit., Secs. 338, 1823. See, also, *Arkansas Bridge Co.* v.

*Kelly-Atkinson Construction Co.,* 8 Cir., 282 F. 802, 805, a case cited by intervenor-appellant; *McKinney* v. *Mobile & Ohio R. Co.,* 215 Ala. 101, 109 So. 752, 48 A. L. R. 1003; *New York Central R. Co.* v. *William Culkeen & Sons Co.,* 249 Mass. 71, 144 N. E. 96; *Kirshenbaum* v. *General Outdoor Adv.,* 258 N. Y. 489, 180 N. E. 245, 84 A. L. R. 645; *Greene* v. *Birdsey,* 45 Ga. App. 103, 163 S. E. 242; *Smith* v. *Mac-Donald,* 37 Cal. App. 503, 174 P. 80.

How is it as to the rights of the Intervenor against the Marble Company? We think the Intervenor was a third party beneficiary under the contract between the Church and the Contractor. Each contract contained identical provisions which contemplated a remedy by collateral contractors against each other for damages caused by one to the other. The second part of Article 6, above set out, ▆ expressly requires a "contractor" damaged by a "person [person includes collateral contractor] held to the Owner by stipulations such as the above * * * to settle with such person by agreement or arbitration." This certainly implies that collateral contractors are beneficiaries of the separate contracts between each of the others and the Owner and a provision of said contracts implies a right to recover from the injuring contractor and to submit to agreement or arbitration.

Other sections of the General Conditions not of interest to the general reader which bear on this question of third party beneficiary are three, ten, twenty-two, forty-one, and seventy. These provisions are patently for the benefit of the other contractors collaborating on the chapel, and give rise to a right of action in favor of one not a party to the contract. *M. H. Walker Realty Co.* v. *American Surety Co.,* supra; *Montgomery* v. *Spencer and Rief,* 15 Utah 495, 50 P. 623; *Thompson* v. *Cheesman,* 15 Utah 43, 48 P. 477; *Christensen* v. *Realty Company,* 42 Utah 70, 129 P. 412; *Assets Realization Co.* v. *Cardon,* 72 Utah 597, 605, 272 P. 204; *Kelly* v. *Richards,* 95 Utah 560, 569, 83 P. 2d 731.

The district court found that Child & Company was damaged to the extent of $6,000, according to the stipulation, but concluded no cause of action lay against the Marble Company. In view of what has been said the trial court was wrong in this conclusion. Judgment should have been rendered in favor of Intervenor and against the Marble Company for $6,000.

As to the rights of the Intervenor against the Surety, the liability of the Surety is based on the bond and only those parties made beneficiaries by the bond can have an action thereon. *Montgomery* v. *Rief*, supra; *Smith* v. *Bowman*, 32 Utah 33, 43, 88 P. 687, 9 L. R. A., N. S. 889; *Blyth-Fargo Co.* v. *Free*, 46 Utah 233, 148 P. 427; *German Alliance Insurance Co.* v. *Home Water Supply Co.*, 226 U. S. 220, 33 S. Ct. 32, 57 L. Ed. 195, 42 L. R. A., N. S., 1000; *B. F. Sturtevant Co.* v. *Fidelity & Deposit Company*, 2 Cir., 285 F. 367; *National Bank* v. *Gulf, C. & S. F. Ry. Co.*, 95 Tex. 176, 66 S. W. 203; *Fidelity & Deposit Company* v. *Rainer*, 220 Ala. 262, 125 So. 55, 77 A. L. R. 13; *Pankey* v. *National Surety Co.*, 115 Ore. 648, 239 P. 808.

It is true that the contract with the Marble Company is made part of the bond and that this contract states what is to be performed and what constitutes a breach, but the contract cannot be used to impose a liability not contemplated by the bond. Consequential damage suffered by Child & Company through failure of the Marble Company to deliver as it agreed was not contemplated as within the obligation of the bond. *Reed* v. *Adams Steel & Wire Works*, 57 Ind. App. 259, 106 N. E. 882; *Montgomery* v. *Rief*, supra, and other cases above cited.

Child & Company is not in the position of a laborer or material man so far as the Marble Company's contract is concerned. Hence, all the cases cited by Intervenor on this portion of the case are not in point.

In consequence of what has been above said, it is ordered that the judgment of the trial court dismissing the action against the Hartford Accident and Indemnity Company be

set aside and a new trial granted to try out the issue of defendant's damage, if any, due to plaintiff's non-compliance with the contract, in accordance with the holdings of this opinion, and subtract the same from plaintiff's damages due to the, Contractor's default; that the judgment dismissing the action of Child & Company, Intervenor, as to the Inter-Mountain Marble Company, be set aside and judgment be entered in favor of Child & Company against the Inter-Mountain Marble Company for the sum of $6,000.

Judgment as otherwise rendered by the district court and appealed from is affirmed. Costs of this appeal are awarded to plaintiff as against the Surety, and one-third of its costs of appeal to Child & Company against the Inter-Mountain Marble Company.

MOFFAT, C. J.; and LARSON and McDONOUGH, JJ., concur.

PRATT, Justice.

I dissent from the prevailing opinion as to the rules applicable between the owner, the contractor and the surety.

I find it impossible to believe there is fairness in making such an unlimited application of the rule applicable to a surety for compensation, as is done in the prevailing opinion. After all, we are but interpreting the terms of a contract. Considerations pass between the parties to many contracts which come up for our interpretation. This is just one of them.

In this case, the bond, the contract, and the specifications, are as one, expressly made so by their terms. In my opinion, one of the most important things about these instruments is, that by the contract, it was intended that expenditures from the contract price were not to run away from the quantum of performance. This is evidenced by the 90% provision of Article 3, quoted in the prevailing opinion, and also by the following provision entitled, "Payments withheld":

"The Architect may withhold or, on account of subsequently discovered evidence, nullify the whole or a part of any certificate for payment to protect the Owner from loss on account of:

\* \* \*

"(d) A reasonable doubt that the contract can be completed for the balance then unpaid."

For a discussion of the meaning of the 90% provision, I invite attention to the case of *Southern Real Estate & Financial Co.* v. *Bankers' Surety Co.*, Mo. Sup., 184 S. W. 1030.

Against what loss to the owner does the surety act as a shield? Can we not characterize it this way: "I will guaranty that the contractor will carry out the provisions of your contract within its limitations and all reasonable modifications and alterations thereof; but I do not guaranty that you, the owner, will abide those provisions." The surety does not guaranty the conduct of the owner. It is the contractor's misconduct from which the surety is paid to afford protection.

The Inter-Mountain Marble Company, in this case, did not abandon the contract, nor refuse to proceed. It apparently would have continued. What happened was, that, when it presented its request for a payment, as it had done numerous times before, the representative of the owner refused to make any further advances. The contractor was unable to continue without advances. The unfair thing about the owner's action in this case is, that such refusal did not occur until the expenditures, in relation to the contract price, outweighed the contractor's performance by a ratio of nearly 100% expenditures to about a 50% performance. Is it to be wondered that the contractor was willing to surrender responsibility—all incentive to continue was gone. However, that discrepancy alone might not justify a release of the surety, but if there is added to it a failure of the owner, through its agents the architects, to apply any of the provisions of the contract intended as a protection to the owner— and to the surety—I can see absolutely no reason for shifting to the shoulders of the surety losses which might well

have been avoided by the owner's compliance with those provisions.

One cannot escape the conclusion that the owner knew, or had good reason to believe, from the first, what would happen if its advancements were withdrawn. Having assumed the burden of financing the contractor from the beginning, it would seem that the owner should have been especially careful to apply the terms of the contract which afforded it protection against such a loss as occurred here.

The contractor was, from the first, seeking to finance itself solely out of the funds of this contract. Article 1 of the contract provided that it should bear the expense, and furnish the material, labor, etc., to deliver marble F. O. B. Washington, D. C. This provision was ignored by the owner. As one witness, one of the architects, stated:

"I know that over thirteen thousand dollars, including the first payment, was paid the Marble Company before the first car of marble had reached Washington, and it was paid because we had materials at the quarry which more than over paid anything they had requested. They had actually quarried the blocks out, which meant expense that they had been put to, which we considered collateral."

Is this attitude consistent with the express provisions of the contract?

The contract called for 90% payments. This was ignored. It required a 10% retention of amounts due until 15 days after completion. This was ignored. No effort was made by the architects to check expenditures against performance in the light of the balance remaining unpaid on the contract. It was provided that the final payment should constitute a waiver of all claims by the owner. Evidently this is to be ignored as well. Monthly payments were to be made. They ran as high as four a month. What can one say of such lack of interest in the terms of the contract, which are particularly applicable to the owner? Should it be ignored in order to allow the owner a recovery? I could list other provisions of the contract not applied by the owner, which, though they probably had no effect upon the ultimate outcome of

the action of the owner and the contractor, at least, with those above, indicate an utter indifference as to the terms of the contract. The waiver clause in the bond was not intended as an excuse for indifference in compliance with the terms.

One of the architects prepared the contract in this case, not an attorney, so that we should feel no hesitancy in believing that he knew of its contents. By its terms, the contract made the architects the agents of the owner.

In the case of Southern Real Estate & Financial Co. v. Bankers' Surety Co., referred to above, the court gives some explanation of the change from the rule applicable to accommodation sureties to the rule applicable to the surety for compensation. This is the court's language in part [184 S. W. 1033] :

"* * * They simply relaxed the rule strictissimi juris as against these corporations" [referring to corporate sureties for compensation], but did not deny them the aid of the courts in the enforcement of their fair and reasonable contracts, *nor refuse to interpret them, as all other contracts are interpreted, in accordance with the reasonable intent of the parties plainly expressed upon their face."* (Italics added.)

Again the court said:

"The surety in these cases is between the upper and nether mill-stones. He is not in position to take care of himself. The contractor and owner have him in their power. If the job should prove an unprofitable one they have it in their power to make it profitable to themselves at the expense of the surety, as is demonstrated by the facts in this case. *The only protection he has lies in the carrying out of the terms of the contract which give him protection. He cannot interfere in the work, but is entitled to the reasonable performance of the duties of the architect, designed for his protection.* * * * [Italics added.]

"While the owner may waive this provision of the contract so far as his own interest is affected by making the payments without a certificate, or upon a defective one, *or by not making a timely objection when an objection is called for by the circumstances,* it is equally evident that he cannot waive it for the surety, an adverse party to the same contract. * * *" (Italics added.)

It might be wondered in that case, why the decision was against the surety after such a recitation as above. This arose out of the fact that the sole question submitted to the court was whether or not payment upon *defective certificates* was such a breach as to release the surety, and the court held it was not as it did not go to the root of the contract so that a failure to perform it would make the performance of the rest of the contract a thing different in substance from what was contemplated. The question of lack of an allegation of performance by the owner was ruled out as coming too late. The question of whether the architect actually checked expenditures against contract price and performance was not involved. It was solely a question of a recitation of facts in the certificate.

In *Royal Indemnity Co.* v. *Northern Granite & S. Co.*, 100 Ohio St. 373, 126 N. E. 405, 12 A. L. R. 382 and *New York Indemnity Co.* v. *Hurst*, 252 Ky. 59, 66 S. W. 2d 8, 94 A. L. R. 876, other cases of similar import may be found. The Federal cases seem to recognize a release of the surety.

Williston on Contracts, Revised Edition, Vol. 4, sec. 1212A, page 3491, has this to say:

"In respect to the interpretation of the corporate compensated surety's contract, where the language used is clear, the rules of interpretation are the same as those applied to the contract of an accommodation surety. The contract 'cannot be one contract where the surety is compensated, and another contract when the surety is not compensated'. * * *"

And at page 3493:

"In respect to the surety's defenses, however, some modifications have appeared. The courts 'have recognized that the corporate surety is in a better position to protect itself against improper conduct on the part of the principal and obligee', than is the accommodation surety. And the same is true of other dealings between the principal and creditor. While the law will allow the accommodation surety to escape liability by the assertion of certain defenses even though he has suffered no harm, in general the corporate surety may not take advantage of such defenses unless he can show injury. * * *"

In Section 1243, page 3559, Williston says this:

"* * * Nevertheless, it is obvious that the surety's risk may be varied by the creditor's conduct, and, if it is, the surety should be discharged. Therefore, any breach by the creditor of his contract with the principal, if he thereby varies the surety's risk, discharges him. * * * Even though the creditor's variation from his promise is favorable to the principal so that he could make no objection, the surety may be freed. A common illustration of this arises where premature payment is made to a contractor whose performance has been guaranteed. * * *"

At page 3490, in Sec. 1212A, there is this definition: ·

"* * * Suretyship is a relation involving two persons, principal and surety, who are bound to a third person, the creditor, for the same debt. * * *"

It is apparent from the authorities that the reason for distinguishing between the paid surety and the accommodation surety is, that the former, having received consideration for its obligations, should not be permitted to escape liability upon a technicality. But it is a far step from a technicality to the failure of the owner in this case. The owner is just as much a contracting party as the surety. Why then should the owner be permitted to shift the burdens of its own derelictions to the shoulders of the surety and compel it to prove injury? The surety did nothing wrong. The harm was done before it came into the picture. Should one be given a premium for ignoring the terms of his own contract? It may be true that after the owner awakened to its duty and took over performance of the contract, the surety cannot prove that there was any waste or mismanagement; but the real injury to the surety was done before that, and no one knows what might have been the situation had the owner insisted upon an equilibrium between expenditures and performance upon the part of the contractor. It is not inconceivable that rather early in the transactions it might have developed that the contractor's estimates were so far afield that a modification of the contracts would, in fairness to all, have been justified.

I am of the opinion that we should, under these circumstances, recognize a complete release of the surety.